**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| WENCESLAUS PROVOST, JR., | Civil Action No.: |
| *Plaintiff,* | 2:18-cv-08845 |
| v. | |
| FIRST GUARANTY BANK, M.A. PATOUT & SON, LTD, LLC, GLENN DUHON, and RANDALL ROMERO, | |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT

Plaintiff, Wenceslaus Provost, Jr. ("Plaintiff" or "Mr. Provost") brings this lawsuit and files this First Amended Complaint against Defendants First Guaranty Bank, M.A. Patout & Son, Ltd, LLC ("M.A. Patout"), Glenn Duhon, and Randall Romero (collectively, the "Defendants"), seeking all available relief under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*; and law of contract and unjust enrichment in the state of Louisiana.

## I.     INTRODUCTION

1.      This case alleges a discriminatory scheme by First Guaranty Bank and M.A. Patout sugar mill, and their executives, to profit at the expense of, impair and extinguish the sugarcane

farm of Wenceslaus Provost, Jr., one of the last remaining African-American sugarcane farmers in Louisiana, and to replace him with white sugarcane farmers.

2.     Mr. Provost is an experienced and skilled sugarcane farmer.  He grew up working extensively on his father's sugarcane farm, and when he launched his own farm in 2008, he received the award for Iberia Parish Farm Bureau Farmer of the Year due to his outstanding farming practices.  Yet, despite Mr. Provost's evident competency, First Guaranty Bank, which provided him with loans, and M.A. Patout, which harvested and purchased his sugarcane, engaged in multiple unlawful acts, beginning in 2007, to drive Mr. Provost out of the sugarcane farming business.

3.     Sugarcane farmers often depend heavily on annual crop loans guaranteed by the United States Department of Agriculture ("USDA") to finance their operations.  To operate his sugarcane farm from 2008 through 2015, Mr. Provost applied for USDA-guaranteed crop loans from First Guaranty Bank.  From 2008 through 2015, First Guaranty Bank and its Senior Vice President Glenn Duhon committed multiple acts of misconduct to deprive Mr. Provost of timely, adequate, and fair loans to effectively farm.  Specifically, First Guaranty Bank and Senior Vice President Duhon:

> i.      routinely instructed Mr. Provost to sign blank crop loan applications;
>
> ii.     unilaterally filled out the terms of those crop loan applications without disclosing the completed applications to Mr. Provost;
>
> iii.    required Mr. Provost to unnecessarily assume unrelated, significant debt belonging to his father as a condition of receiving crop loans;
>
> iv.     required Mr. Provost to provide excessive collateral as a condition of receiving crop loans;

v.      required Mr. Provost to lease equipment to M.A. Patout on highly unfavorable terms as a condition of receiving crop loans;

vi.      prohibited Mr. Provost from operating through a limited liability corporation or from purchasing his father's farmland;

vii.      required Mr. Provost to reduce the acreage of his farm as a condition of receiving crop loans;

viii.      repeatedly awarded Mr. Provost crop loans that were substantially smaller in value than what was requested and necessary to effectively operate his farm;

ix.      modified, without disclosure, Mr. Provost's loan applications to reduce his loan amounts by, among other actions, photocopying his signature;

x.      diverted monies, without disclosure, from Mr. Provost's crop loans to prematurely compensate M.A. Patout;

xi.      repeatedly and without disclosure diverted monies from Mr. Provost's crop loans to prematurely discharge debts from prior years' crop loans;

xii.      repeatedly and without disclosure diverted monies from Mr. Provost's crop loans to prematurely discharge other non-guaranteed loans maintained by First Guaranty Bank;

xiii.      delayed, without disclosure, the approval of Mr. Provost's loan applications in 2012 and 2014;

xiv.      routinely charged Mr. Provost unreasonably inflated interest rates on crop loans and non-guaranteed loans;

xv.      facilitated M.A. Patout's decision in 2014 to stop accepting sugarcane harvested by Mr. Provost, in clear breach of his contract with the mill;

xvi.      rejected Mr. Provost's crop loan applications in 2013 and 2015;

xvii.      forced Mr. Provost alone to pay down three loans taken by his father even though Mr. Provost's two brothers were also co-signers on those loans; and

xviii.      repeatedly failed to disclose to Mr. Provost the multiple adverse credit actions and decisions made by the bank regarding the loans awarded to him.

4.      First Guaranty Bank and Mr. Duhon did not treat similarly situated white farmers in the same manner.

5.      When Mr. Provost produced the sugarcane from his farm each year, he sold it to M.A. Patout, pursuant to a written contract entered into by both parties in 2007. From 2007 through 2015, M.A. Patout and its CEO Randall Romero committed multiple acts to impair and terminate Mr. Provost's farm. Specifically, M.A. Patout and CEO Romero:

     i.          awarded Mr. Provost a crop loan in 2007 that was substantially smaller in value than what was requested and necessary to effectively operate his farm;

     ii.         coordinated with First Guaranty Bank to receive premature payments from Mr. Provost's 2008 crop loan to discharge the 2007 crop loan;

     iii.       coordinated with First Guaranty Bank to obtain access to and possession of Mr. Provost's equipment against his wishes at submarket rates;

     iv.       denied Mr. Provost access to farming equipment or services that were routinely provided to neighboring white farmers;

     v.        persuaded landowners to sever their ties with Mr. Provost, who had farmed their land, and instead contract with white farmers; and

     vi.       refused to harvest and purchase Mr. Provost's sugarcane, in breach of the longstanding written contract, after Mr. Provost refused to sign an alternate contract providing more favorable terms to the mill.

6.      M.A. Patout and CEO Romero did not treat similarly situated white farmers in the same manner.

7.      To effectuate the conspiracy, First Guaranty Bank and Senior Vice President Duhon made multiple, knowing misrepresentations to USDA through crop loan applications and other communications. Those material misrepresentations allowed First Guaranty Bank and Senior Vice President Duhon to secure valuable USDA loan guarantees while simultaneously concealing from

USDA that they were saddling Mr. Provost with unwanted and unnecessary debts, diverting substantial crop loan funds to prematurely discharge other loans provided by First Guaranty Bank and M.A. Patout, and denying crop loans to Mr. Provost based on false pretenses, including pretenses fabricated by M.A. Patout.

8.      The unlawful discrimination committed by Defendants was unknowable to Mr. Provost until May 2014, when a whistleblower at the local office of the Farm Service Agency ("FSA"), a division of USDA, alerted Mr. Provost that: 1) he was being treated differently by First Guaranty Bank than other sugarcane farmers, who were white; and 2) undisclosed adverse and unlawful actions on his existing accounts had been taken over the previous years.   This whistleblower subsequently allowed Mr. Provost to access critical documents in April 2015, including electronic communications between the Defendants and loan-related materials submitted by First Guaranty Bank to USDA, which revealed to Mr. Provost for the first time that First Guaranty Bank and Senior Vice President Duhon had engaged in a pattern of fraudulent misrepresentation to USDA to the detriment of Mr. Provost.

9.      The effect of Defendants' misconduct was predictable and known to Defendants: without access to timely and sufficient crop loan monies, and subject to unfair loan terms and multiple other discriminatory acts, Mr. Provost was unable to generate a sufficient yield from his farming operations and was ultimately forced to exit the sugarcane farming business in 2015.  The financial and emotional costs to Mr. Provost and his family as a result of Defendants' misconduct were severe, including the loss of their business and home and the need for psychological treatment for depression and anxiety.

10.     This case filed by Mr. Provost seeks to recover the damages directly caused by Defendants' unlawful conduct.  The misconduct engaged in by First Guaranty Bank and Senior Vice President Duhon violated ECOA; the misconduct engaged in by M.A. Patout constituted a breach of contract; and the misconduct engaged in by all Defendants violated RICO.  Mr. Provost seeks statutory, compensatory, consequential, treble, and punitive damages, as well as restitution, disgorgement of ill-gotten monies, injunctive relief, and reasonable attorneys' fees.

## II. PLAINTIFF

11.     Wenceslaus Provost, Jr. resides in New Iberia, Louisiana.   Until the events described herein, Plaintiff was a respected and award-winning African American sugarcane farmer.

## III. DEFENDANTS

12.     First Guaranty Bank is a bank headquartered in Hammond, Louisiana.

13.     Glenn Duhon is the Senior Vice President and Regional Manager of First Guaranty Bank and a resident of Vermilion Parish.

14.     M.A. Patout is a sugar mill headquartered in Jeanerette, Louisiana.  M.A. Patout describes itself as the oldest complete family owned and operated manufacturer of raw sugar in the United States.  M.A. Patout was started in 1825 by the Patout family as a sugarcane plantation with substantial slave holdings, and the Patout family still owns the company.

15.     Randall Romero is the Chief Executive Officer of M.A. Patout and a resident of Vermilion Parish.

## IV. JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over Plaintiff's claims under federal law pursuant to 28 U.S.C. § 1331, which confers jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."

17.     This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), which confers federal subject matter jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  As discussed below, Plaintiff's state-law claims arise from a common set of operative facts—*i.e.,* his farming and loan activities with Defendants—and are so related to the claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy.

18.     Venue is proper pursuant to 28 U.S.C. § 1391 as this is a judicial district in which at least one Defendant resides, and all defendants are residents of the State of Louisiana.

19.     This court has personal jurisdiction over the Defendants.  Both First Guaranty Bank and M.A. Patout are incorporated in, and have their principal place of business in, the State of Louisiana, and they engaged in the misconduct alleged herein in the State of Louisiana.  Both Vice President Duhon and CEO Romero reside in the State of Louisiana, and all of the misconduct alleged herein occurred in the State of Louisiana.

## V. FACTS

**A.**   **Background on Sugarcane Farming**

20.     Sugarcane farming has been an important part of Louisiana's economy since the 1700s.  Sugarcane is produced on more than 400,000 acres of land in 22 Louisiana parishes—with production of approximately 13 million tons yearly.  About 17,000 employees are involved in the production and processing of sugarcane in Louisiana.

21.     Less than a generation ago, there were approximately 60 African-American families engaged in sugarcane farming, and many of those families operated multiple farms. Following the loss of Mr. Provost's farm, only four sugarcane farms operated by African-Americans remain in Louisiana.

22.     Most sugarcane farmers secure and rely on crop loans each year.  The loan proceeds are expended on items such as farm equipment, fuel, seeds, fertilizer, pesticides, insurance, labor, land rental, repairs, and general farm operating expenses.  Sugarcane farmers who rely on crop loans must receive timely and sufficient crop loans to operate their farms effectively.

23.     One type of loan available to sugarcane farmers is a loan provided by a financial institution that is guaranteed by USDA.  The Guaranteed Farm Loan Program operated by USDA helps farmers obtain loans from USDA-approved commercial lenders at reasonable terms to finance agricultural production.  Financial institutions benefit from the safety net provided by USDA, which guarantees farm loans up to 95 percent against possible financial loss of principal and interest.

24.     With a Guaranteed Farm Loan, the lender is USDA's customer, not the loan recipient.  The lender and loan recipient complete an Application for Guarantee and submit it to the FSA in their lending area.  An FSA loan officer reviews the application for eligibility, repayment ability, adequacy of collateral, and compliance with other regulations, and if the applicant meets those requirements, the request is approved.  The FSA issues the lender a conditional commitment outlining the terms of the loan guarantee and indicating that the loan may be closed.  The lender then closes the loan and advances funds to the applicant, after which the FSA staff issues the guarantee.  The lender makes the loan and services it to conclusion.  In the event the lender suffers a loss, FSA will reimburse the lender according to the terms and conditions specified in the guarantee.

25.     In determining the amount of crop loans to provide to sugarcane farmers, financial institutions and FSA typically rely on credible estimates of the cost of sugarcane production.  In Louisiana, the Agricultural Extension Program of Louisiana State University's Agricultural Center ("LSU") establishes widely-respected guidelines for sugarcane production that are relied upon by financial institutions and FSA to determine loan amounts.  LSU's guidelines provide specific instructions on the estimated cost of production per acre of sugarcane in Louisiana.

26.     During the period 2007 through 2015, LSU guidelines estimated that the cost of sugarcane production ranged between $500 and $700 per acre.

27.     Interviews with white sugarcane farmers in Louisiana verify that they receive loans of approximately $500-$700 per acre from financial institutions to operate their farms, which is consistent with LSU guidelines.

28.     According to LSU guidelines, in order to operate a sugarcane farm effectively, farmers must apply fertilizer and pesticides by March and must plant new sugarcane no later than August 30.   According to LSU guidelines, if sugarcane is planted in September, the farm is expected to yield five tons less per acre than if it was planted in August.   Similarly, if sugarcane is planted in October, the farm is expected to yield ten tons less per acre as compared to proper planting by August.   For these reasons, farmers must receive crop loans by February in order to satisfy the timeline established by LSU guidelines.

29.     Historically, lending practices for African American farmers in the South, including Louisiana, have been replete with discrimination.   Even after the end of the Jim Crow era and into the late 20th Century, it took an average of three times longer for the USDA to process a black farmer's loan application than a white farmer's loan application.   This systemic discrimination led to the nationwide class action of *Pigford v. Glickman* against the USDA, alleging racial discrimination against African-American farmers in USDA's allocation of farm loans and assistance between 1981 and 1996.   Settled in 1999, the *Pigford* case provided almost US$1 billion to more than 13,300 farmers under the settlement's consent decree, which is reportedly the largest civil rights settlement to date.

30.     The claims in *Pigford* shined a glaring light on the fact that while the law and regulations implementing loans to farmers were colorblind, the people carrying them out were not. Denial of fair loan terms to black farmers and preferential treatment of white farmers forced most black farmers out of agriculture during the 20th century.   The Defendants here—as with the bad

actors in the *Pigford* matter—have effectively and discriminatorily forced a decorated African American farmer out of the agriculture business and stripped him of his home and other assets.

**B.**     **Background on Provost Family**

31.     Mr. Provost's father was a sugarcane farmer and operated a farm covering approximately 4,000 acres, most of which was leased.  At the age of six, Mr. Provost first began working on his father's farm.  While Mr. Provost attended high school, he worked on his father's farm every day after school.  When Mr. Provost graduated from high school, his father provided him access to 21 acres of farmland so that Mr. Provost could start his own sugarcane farm.

32.     By 1994, Mr. Provost was ranked first in the state for his non-quota sugarcane yield per acre and was awarded the state's high yield award.  From 1994 through 2007, Mr. Provost's farm grew from 21 acres to 300 acres, and during that time period, his yield was at or above the state average each year.

33.     Due to Mr. Provost's extraordinary farming practices, he received multiple awards. In 2008, he received the "Young Farmers and Ranchers Achievement Award" in recognition of his "Outstanding Contribution to Agriculture" from the Farm Bureau of Louisiana.  In 2008, Mr. Provost also received the prestigious award of Iberia Parish Farm Bureau Farmer of the Year due to his outstanding farming practices.   In 2010 and 2012, he won awards for "Outstanding Accomplishments in the Conservation of Soil, Water, And Related Natural Resources" from the Iberia Soil and Water Conservation District.  In 2010, he was also elected to Vermillion Parish's Sugarcane Advisory Committee.

34.     Mr. Provost's father had obtained crop loans to operate his farm from Mid-South Bank.  In 2006, Mid-South Bank exited the business of providing loans to sugarcane farmers.  The next year, Mr. Provost's father chose to retire from sugarcane farming.

35.     In 2007, Mr. Provost decided to expand his farming operations.  He replaced his father as the lessee on multiple farmland leases and soon operated a sugarcane farm comprised of approximately 4,300 acres.  Because Mid-South Bank had exited the business of providing crop loans, Mr. Provost first obtained a temporary one-year crop loan from M.A. Patout in 2007 and subsequently obtained crop loans from First Guaranty Bank beginning in 2008.  From 2008 through 2015, Mr. Provost annually applied for crop loans from First Guaranty Bank to finance the operation of his farm.

36.     On March 21, 2007, Mr. Provost entered into and signed a 14-year agreement whereby M.A. Patout agreed to harvest and purchase all of the sugarcane grown by Mr. Provost beginning in the year 2007 and continuing annually through and including 2021. The terms provided that M.A. Patout would cut and harvest Mr. Provost's sugarcane for a fee of $4 per ton between 2007 and 2012 and for a fee of $5 per ton for the remainder of the contract period.

37.     From 1994 through 2007, Mr. Provost averaged approximately 5,000 lbs per acre in his yield.  Yet, from 2008 through 2015, immediately after he began obtaining crop loans from First Guaranty Bank, Mr. Provost's yield plummeted by approximately 52% to an average of approximately 2,400 lbs per acre.  This sharp decline in yield per acre is a direct consequence of Defendants' misconduct described herein.

C.    **Crop Loan Provided by M.A. Patout in 2007 Was Too Small and Inconsistent with Standard Practice**

38.    At the beginning of 2007, Mr. Provost registered, with FSA, his intent to farm 4,326.33 acres of sugarcane. That same year, after entering into a 14-year contract with M.A. Patout to harvest and purchase his sugarcane, Mr. Provost obtained a temporary one-year crop loan from M.A. Patout, which also operated as a lender.  Specifically, on March 21, 2007, M.A. Patout awarded Mr. Provost a non-guaranteed crop loan for $682,000.  M.A. Patout provided that one-year loan with the expectation and understanding that Mr. Provost would secure crop loans from a traditional bank in subsequent years.

39.    The loan amount provided by M.A. Patout was substantially lower than the amount recommended by LSU guidelines.  In 2007, sugarcane production cost was estimated by LSU guidelines to equal $595.48 per acre.  Yet, the $682,000 loan provided by M.A. Patout only amounted to $157.64 per acre.  For that reason, Mr. Provost was also required to rely on limited personal savings and assets to finance the planting of his sugarcane in the fall of 2007.  Upon information and belief, M.A. Patout treated similarly situated white farmers differently, providing them with crop loans that were substantially higher in value per acre.

40.    The loan agreement between Mr. Provost and M.A. Patout provided that he would discharge the loan entirely with the proceeds from the sale of his sugarcane.  M.A. Patout pays farmers for their sugarcane yield during the following year, on a monthly basis, between March and November.  Accordingly, Mr. Provost was expected and contractually obligated to pay the 2007 crop loan from the sugarcane sale proceeds he would receive on a monthly basis in March

through November of 2008.  Indeed, the only collateral that M.A. Patout secured for the crop loan was a lien on the proceeds from the sale of Mr. Provost's sugarcane harvested in 2007.

**D.**   **First Guaranty Bank Instructed Mr. Provost to Sign Blank Crop Loan Applications**

41.    After Mr. Provost secured a temporary, initial crop loan from M.A. Patout for the 2007 season, he applied for and obtained all subsequent crop loans from First Guaranty Bank.

42.    From 2008 until the termination of his farm in 2015, whenever Mr. Provost applied for a crop loan from First Guaranty Bank, he specifically requested that the bank provide a crop loan amount that was based on the annual per-acre recommendations established by LSU.  Mr. Provost made those requests when meeting with one or more bank executives, including Senior Vice President Duhon, each year.

43.    From 2007 until the termination of his farm in 2015, whenever Mr. Provost applied for a crop loan application, First Guaranty Bank instructed him to merely sign a blank application. This allowed First Guaranty Bank to unilaterally insert the terms for the crop loan application— including the amount and the interest rate—and develop the farm operating plan.  First Guaranty subsequently submitted each application to FSA for review and concurrence, without first showing the application to Mr. Provost.  In fact, the first time that Mr. Provost ever saw his completed crop loan applications was when a whistleblower at FSA provided him access to those documents beginning in April 2015.

44.    When completing Mr. Provost's crop loan applications, First Guaranty Bank did not employ LSU's guidelines.  Rather, First Guaranty Bank employed crop input and revenue calculations based on *ad hoc* internal decision-making.  Upon information and belief, First

Guaranty Bank's use of internal *ad hoc* crop input and revenue calculations, rather than the LSU guidelines, is a term and condition of the loan process that was not applied to similarly situated white farmers.  Due to First Guaranty Bank's knowledge of the LSU guidelines, the bank knew that its practice of providing loan funds for insufficient amounts, or later in the season, would cause Mr. Provost's farm to ultimately fail.

45.     While entirely controlling the application process for loans provided to Mr. Provost, First Guaranty Bank chose not to, and failed to, provide information to Mr. Provost regarding the availability of loan options or other financial assistance that held terms and conditions similar to loans provided to white sugarcane farmers.

46.     In 2009, Mr. Provost attempted to secure an accountant to assist with operating the finances of his farm.  Yet, First Guaranty Bank dissuaded him from doing so.  Senior Vice President Duhon told Mr. Provost that there was no need for him to hire an accountant because the bank "will catch things better than any accountant."

**E.     First Guaranty Bank Imposed Unreasonable Conditions on Mr. Provost to Provide His First Crop Loan**

47.     Despite Mr. Provost's substantial experience in sugarcane farming, First Guaranty Bank imposed multiple unreasonable and onerous requirements and restraints on his first application for a crop loan, which was submitted on January 30, 2008.  Those requirements and restraints remained in effect and harmed Mr. Provost's farming operations through the termination of his farm in 2015.

48.     First, First Guaranty Bank refused to permit Mr. Provost to operate his farm through a limited liability corporation, as is standard practice in the sugarcane industry.  Mr. Provost had previously incorporated a limited liability corporation called Wenceslaus Provost Jr. Farms LLC in March 2007 for the purposes of operating his farm.  When he applied for a crop loan in 2008, First Guaranty Bank refused to award him a loan if he operated, or received funds through, that limited liability corporation.  Instead, First Guaranty Bank insisted that Mr. Provost dissolve the limited liability corporation in 2009 and secure the crop loan in his personal capacity.  The effect of this unreasonable prohibition is that Mr. Provost's assets, including his home and bank accounts, were now more vulnerable to being seized by the bank in the event of default.  First Guaranty Bank routinely permitted similarly situated white farmers to operate their sugarcane farms through limited liability corporations.

49.     Second, First Guaranty Bank required Mr. Provost to assume certain debts of his father as a condition of applying for a crop loan.  Mr. Provost's father had an outstanding emergency loan for $234,000 that his father secured from FSA; Mr. Provost was *not* a co-signer on that loan.  Although Mr. Provost had absolutely no interest in assuming his father's emergency loan, and although there was no legal reason for Mr. Provost to do so, First Guaranty Bank nonetheless required Mr. Provost to assume the loan as a condition of applying for a crop loan for his own farm.  Mr. Provost and his father strongly opposed forcing Mr. Provost to assume the debt of his father, which was unrelated to Mr. Provost's farming operations, and Mr. Provost articulated his opposition repeatedly to First Guaranty Bank, including to Senior Vice President Duhon.  First

16

Guaranty Bank did not require similarly situated white farmers to assume the unrelated debts of their parents as a condition of providing crop loans to these farmers.

50.    Third, First Guaranty Bank required Mr. Provost to purchase his father's equipment, which Mr. Provost had absolutely no interest in purchasing.  Mr. Provost's father owned farming equipment—consisting of two combines, seven dump wagons and four trailers—that he leased to M.A. Patout, which in turn primarily used the equipment to harvest the crops of other farmers in the region, who were nearly all white.  M.A. Patout had secured highly favorable terms for itself on the lease from Mr. Provost's father, as the mill was only obligated to make payments to him (of 73 cents per ton) when the equipment was used on Mr. Provost's father's farm and *not* when the equipment was used on other farms (which constituted the bulk of the equipment's use).  As a condition of providing Mr. Provost a crop loan, First Guaranty Bank required Mr. Provost to purchase that same equipment from his father and simultaneously lease it to M.A. Patout under the same exact unattractive terms—even though Mr. Provost informed the bank that he did not want to buy that equipment.  Specifically, as a condition of First Guaranty Bank applying for and providing a crop loan to Mr. Provost, First Guaranty Bank required Mr. Provost to take a non-guaranteed loan for $495,000 on May 1, 2008 in order to purchase his father's equipment as well as refinance his personal residence.  In other words, First Guaranty Bank saddled Mr. Provost with an unwanted loan in order to provide M.A. Patout access to equipment at unusually favorable and submarket rates, so that M.A. Patout could primarily use that equipment to harvest the sugarcane of white farmers who were not required to purchase their own harvesting equipment.  After Mr. Provost purchased the equipment, M.A. Patout maintained

17

total possession of the equipment and primarily used it to harvest sugarcane grown by white farmers, without compensating Mr. Provost for that use.  Additionally, all payments made by M.A. Patout under the lease agreement were provided directly to First Guaranty Bank, not Mr. Provost, as a means of discharging Mr. Provost's $495,000 equipment loan; indeed, First Guaranty Bank held a lien on such equipment lease payments.

51.     Fourth, as noted above, as a condition of providing Mr. Provost a crop loan, First Guaranty Bank required him to refinance his home mortgage, which was originally financed by First National Bank of Jeanerette.  Yet, Mr. Provost had never requested that his personal residence be refinanced and, further, was not delinquent nor in default on his residential mortgage held by First National Bank of Jeanerette.  Notably, First Guaranty Bank took a first lien position on Mr. Provost's home in 2008 as a condition of providing the $495,000 loan.  First Guaranty Bank did not subject similarly situated white sugarcane farmers who obtained crops loans to similar residential mortgage or collateral requirements.

52.     Fifth, while First Guaranty Bank forced Mr. Provost to purchase his father's used equipment, which Mr. Provost had no interest in purchasing, the bank prohibited Mr. Provost from purchasing his father's farmland.  Mr. Provost's father owned about 140 acres of land on which he farmed; he leased the remainder of his farm.  Mr. Provost sought to purchase the 140 acres with a loan from First Guaranty Bank, yet the bank refused to lend him the money to do so.  Instead, First Guaranty Bank required that the land be sold to M.A. Patout, which later leased the land to white farmers.  Despite this treatment of Mr. Provost, First Guaranty Bank permitted similarly situated white farmers to obtain loans to purchase land on which they would farm.

53.     Sixth, First Guaranty Bank was only willing to provide a crop loan to Mr. Provost if the funds were disbursed to Mr. Provost under a lender-supervised loan system.  First Guaranty Bank's supervised loan system required Mr. Provost to obtain the bank's prior approval before spending loan funds on any crop operating expenses, including land rental, fertilizer, fuel, chemicals, equipment repairs, and farm labor.  As described below, First Guaranty Bank's control over Mr. Provost's use of loan proceeds prevented him from operating in accordance with the LSU guidelines for planting and growing sugarcane.  First Guaranty Bank did not require that similarly situated white farmers receive crop loans under a lender-supervised loan system.

**F.     First Guaranty Bank Selectively Forced Mr. Provost to Discharge His Father's Loans**

54.     Before expanding his own farm in 2008, Mr. Provost and his two older brothers co-signed three loans that were provided to their father: (1) a $363,000 equipment loan; (2) a $450,000 real estate loan; and (3) a $1,126,251 crop loan, which was reduced to approximately $120,000 by 2008.

55.     Although there were three co-signers on those three loans, First Guaranty Bank only enforced those loans as to Mr. Provost.  First Guaranty Bank never sought payments or assets from Mr. Provost's brothers to pay down those loans, even though those brothers possessed assets and capital, were customers of First Guaranty Bank and were equally responsible for those loans.  Such targeting of Mr. Provost for collection evidences the bank's intent to terminate his sugarcane farm, as his brothers were employed in other industries and not operating sugarcane farms.

56.     First Guaranty Bank forced Mr. Provost to make payments on his father's three loans with portions of the $495,000 non-guaranteed loan described above that First Guaranty Bank

required Mr. Provost to borrow in order to purchase equipment from his father. From Mr. Provost's $495,000 non-guaranteed loan, First Guaranty Bank unilaterally paid: (1) $47,000 of his father's $450,000 real estate loan; (2) a portion of his father's $363,000 equipment loan; and (3) $120,000 of his father's crop loan. Mr. Provost never requested any of those payments be made from his loan proceeds and never authorized those payments.

## G. Crop Loans Provided by First Guaranty Bank to Mr. Provost Were Too Small and Inconsistent with Standard Practice and LSU Guidelines

57. In every year between 2008 and 2015 for which First Guaranty Bank executed a loan application for Mr. Provost, the bank ignored his requests and provided him with a USDA-guaranteed crop loan that was substantially lower in value than the amount he needed—and the amount recommended by LSU guidelines—to operate his farm effectively. First Guaranty Bank treated similarly situated white farmers very differently, routinely providing them with crop loans that were substantially higher in value per acre.

58. When First Guaranty Bank provided loans to Mr. Provost, they awarded him less than half per acre what Mid-South Bank had provided his father. Mid-South Bank provided Mr. Provost's father with an annual crop loan worth, on average, approximately $1.6 million for a farm that covered about 4,000 acres, which is equal to approximately $400 per acre. Yet, during 2008 through 2014, First Guaranty Bank provided Mr. Provost with an annual crop loan that, on average, equaled only approximately $228 per acre.

59.     Meanwhile, similarly situated white farmers in New Iberia and Vermillion parishes received substantially more per acre in crop loans, typically well-within the recommendations of the LSU guidelines, which range from $500 to $700 per acre.  For example, one white farmer in Iberia Parish who contracts with M.A. Patout to sell his sugarcane received $535 per acre in crop loans from First Guaranty Bank; another white farmer in Iberia Parish received approximately $594 per acre in crop loans from a bank; and a third white farmer in Iberia Parish received approximately $533 per acre in crop loans from another bank.

60.     At the beginning of the 2008 sugarcane crop year, Mr. Provost registered, with FSA, his intent to farm 4,326.33 acres of sugarcane.  That year, sugarcane production cost was estimated by LSU guidelines to equal $644.99 per acre.  Yet, on March 3, 2008, First Guaranty Bank only awarded Mr. Provost a crop loan in the amount of $841,000, which is equal to approximately $194 per acre.  As a result, after weeding and fertilizing, Mr. Provost had no available funds to repair or purchase equipment in 2008.  By fall, he lacked sufficient funds to compensate laborers to plant seed cane until November, three months later than LSU guidelines, which note a drastically smaller yield if the sugarcane is not planted by the end of August.  As a result, Mr. Provost's yield was materially smaller that what he would have generated had the crop loan been of adequate size.  These consequences of receiving insufficient loan amounts were replayed each subsequent year in which Mr. Provost obtained a crop loan from First Guaranty Bank.

61.     At the beginning of the 2009 sugarcane crop year, Mr. Provost registered, with the FSA, his intent to farm 4,295.47 acres of sugarcane.  That year, sugarcane production cost was

estimated by LSU guidelines to equal approximately $600 per acre.  Yet, on March 6, 2009, First Guaranty Bank only awarded Mr. Provost a crop loan in the amount of $826,500, which is equal to approximately $192 per acre.

62.     At the beginning of the 2010 sugarcane crop year, Mr. Provost registered, with FSA, his intent to farm 4,045.82 acres of sugarcane.  That year, sugarcane production cost was estimated by LSU guidelines to equal $605.16 per acre.  Yet, on February 24, 2010, First Guaranty Bank only awarded Mr. Provost a crop loan in the amount of $827,000, which is equal to about $204 per acre.

63.     At the beginning of the 2011 sugarcane crop year, Mr. Provost registered, with FSA, his intent to farm 3,769.41 acres of sugarcane.  That year, sugarcane production cost was estimated by LSU guidelines to equal $623 per acre.  Yet, on February 17, 2011, First Guaranty Bank only awarded Mr. Provost a crop loan in the amount of $841,200, which is equal to about $223 per acre.

64.     At the beginning of the 2012 sugarcane crop year, Mr. Provost registered, with FSA, his intent to farm 3,373.20 acres of sugarcane.  That year, sugarcane production cost was estimated by LSU guidelines to equal $674.23.  Yet, on April 14, 2012, First Guaranty Bank only awarded Mr. Provost a crop loan in the amount of $1,066,000, which is equal to about $316 per acre.

65.     At the beginning of the 2014 sugarcane crop year, Mr. Provost registered with the Farm Service Agency, his intent to farm 1,277.37 acres of sugarcane.  That year, sugarcane production cost was estimated by LSU guidelines to equal $647.33.  Yet, on June 19, 2014, First

Guaranty Bank only awarded Mr. Provost a crop loan in the amount of $308,250, which is equal to about $241 per acre.

66.     Notably, Mr. Provost signed the crop loan application on February 28, 2014.  First Guaranty Bank then forged Mr. Provost's signature, by photocopying it, onto three other applications and dated all of them April 14, 2014.  First Guaranty Bank transmitted the first application to FSA on April 17, 2014, with a request for $308,250, and then transmitted the second application on May 7, 2014 that reduced the requested loan amount by $20,000 to $288,250.  Only after FSA complained about the reduction did First Guaranty Bank submit a third application on May 9, 2014, restoring the loan amount to $308,250.

67.     The above calculations for how much Mr. Provost annually received per acre in crop loans do not reflect the actual, lower amount of funds that were available to Mr. Provost each year after the bank unlawfully made unilateral diversions from his crop loans, as detailed below.

68.     First Guaranty Bank's underfunding of Mr. Provost's farm had the predictable and intended effect of substantially lessening the yield from, increasing the cost of operating, and ultimately undermining the viability of his sugarcane farm.

**H.     First Guaranty Bank Diverted Funds from Mr. Provost's Crop Loans in 2008-2012 to Prematurely Discharge Debts from Prior Crop Loans**

69.     Between 2008 and 2012, First Guaranty Bank improperly and fraudulently diverted funds from Mr. Provost's crop loans to discharge debts from his prior crop loans.

70.     For each crop loan awarded to Mr. Provost between 2007 and 2014, the loan terms specified that the loan would be entirely discharged from the *proceeds of the sale* of his sugarcane

that was harvested that year.  As noted above, the proceeds from those sugarcane sales were paid on a monthly basis by M.A. Patout to Mr. Provost during March through November of the following year.  Yet, instead of allowing Mr. Provost to pay down the prior year's crop loan debt from the associated *crop sale proceeds* as stipulated in the loan agreements, First Guaranty Bank diverted, without disclosure to or authorization from Mr. Provost, substantial funds from each year's *crop loan* to discharge the prior year's crop loan debt.  This misuse of crop loan funds is statutorily prohibited and had the predictable effect of inhibiting Mr. Provost from generating a sufficient yield each year.

71.    The reason these improper diversions of funds materially harmed Mr. Provost is the timing of the diversions.  First Guaranty Bank often provided Mr. Provost with crop loan proceeds in February or early March.  Each year, Mr. Provost needed those funds immediately to operate his farm, including to spray herbicide in February and to plant sugarcane by August.  Yet, when or soon after it provided Mr. Provost with crop loan funds, First Guaranty Bank routinely diverted a substantial share of those funds to pay down the prior year's crop loan debt, leaving Mr. Provost with significantly less monies to operate his farm.  Had First Guaranty Bank complied with the loan terms and statutory obligations, the bank would have allowed Mr. Provost to access the full amount of his crop loans to operate his farm and relied, instead, on the crop loan proceeds that Mr. Provost would be receiving later that year, on a monthly basis from March through November, to discharge the prior year's crop loan debts.  In other words, between 2008 and 2012, First Guaranty Bank unlawfully and prematurely paid down crop loans provided by M.A. Patout and First Guaranty Bank by diverting crop loan monies specifically allocated for farm operating

24

expenses, to the detriment of Mr. Provost. This scheme unjustly profited M.A. Patout and First Guaranty Bank, by awarding them substantial monies prematurely, and materially harmed Mr. Provost, by denying him timely access to funds that were supposed to be exclusively allocated to the operation of his farm.

72.     To conceal the diversion of Mr. Provost's crop loans to discharge prior debt, First Guaranty Bank and Senior Vice President Duhon routinely made knowing misrepresentations to FSA in loan applications. First Guaranty Bank and Senior Vice President Duhon submitted loan applications to FSA that specifically stated that the outstanding crop loan from the prior year would be exclusively paid with the proceeds from crops sales. Furthermore, those loan applications forecast, to the cent, exactly how Mr. Provost would spend his crop loan funds on FSA-approved operating expenditures, such as fertilizer and labor. In those forecasts, First Guaranty Bank never disclosed that any funds would be diverted to discharge prior debt.

73.     For example, as noted above, on March 3, 2008, First Guaranty Bank awarded Mr. Provost a crop loan in the amount of $841,000. When USDA approved the guarantee for that loan on February 21, 2008, the USDA stated in a letter, "Funds will be used for family living and operating expenses." Yet, First Guaranty Bank promptly and improperly withdrew $333,053 from Mr. Provost's 2008 crop loan to make a final payment towards the 2007 crop loan that had previously been provided by M.A. Patout. In so doing, First Guaranty Bank unlawfully provided a financial benefit to M.A. Patout at Mr. Provost's expense. The diversion left Mr. Provost with only $491,000 to operate his farm, which only equals approximately $113.5 per acre—a mere fraction of the amount recommended by LSU guidelines. In the 2008 loan application, First

Guaranty Bank and Senior Vice President Duhon made knowing misrepresentations to FSA regarding the payment of outstanding debt for the 2007 crop loan; specifically, the loan application states that the $333,053 debt to M.A. Patout would "be paid from 2007 cane equity" and does not include such payment when itemizing the anticipated expenditures from the 2008 crop loan.

74.     As noted above, on March 6, 2009, First Guaranty Bank awarded Mr. Provost a crop loan in the amount of $826,500.  Yet, First Guaranty Bank promptly and improperly withdrew $73,305 from Mr. Provost's 2009 crop loan to make a final payment towards the 2008 crop loan that had previously been provided by First Guaranty Bank.  The diversion left Mr. Provost with only $753,195 to operate his farm, which only equals approximately $175.35 per acre—a mere fraction of the amount recommended by LSU guidelines.  In the 2009 loan application, First Guaranty Bank and Senior Vice President Duhon made knowing misrepresentations to FSA regarding the payment of outstanding debt for the 2008 crop loan; specifically, the loan application states that the remaining debt from the prior year's crop loan would "be paid from molasses & equity payments" and does not include such payment when itemizing the anticipated expenditures from the 2009 crop loan.

75.     As noted above, on April 14, 2012, First Guaranty Bank awarded Mr. Provost a crop loan in the amount of $1,066,000.  Yet, First Guaranty Bank promptly and improperly withdrew $103,752 from Mr. Provost's 2012 crop loan to make a final payment towards the 2011 crop loan that had previously been provided by First Guaranty Bank.  The diversion left Mr. Provost with only $962,248 to operate his farm, which only equals approximately $285.26 per acre—a mere fraction of the amount recommended by LSU guidelines.  In the 2012 loan

application, First Guaranty Bank and Senior Vice President Duhon made knowing misrepresentations to FSA regarding the payment of outstanding debt for the 2011 crop loan; the loan application does not include such payment when itemizing the anticipated expenditures from the 2011 crop loan.

76.     When First Guaranty Bank made these diversions from Mr. Provost's crop loans to pay down prior years' crop loan debt, First Guaranty Bank failed to notify Mr. Provost of the diversion (or provide any reason for the diversion).  First Guaranty Bank also concealed the completed loan applications, which contained the fraudulent representations and expenditure forecasts, from Mr. Provost, who only discovered them when he obtained documents from a whistleblower at the FSA beginning in April 2015.

77.     First Guaranty Bank's improper diversion of Mr. Provost's crop loan funds to discharge prior years' crop loan debts had the predictable and intended effect of substantially lessening the yield from, increasing the cost of operating, and ultimately undermining the viability of his farm.

78.     Upon information and belief, First Guaranty Bank and Senior Vice President Duhon did not divert monies from crop loans awarded to similarly situated white farmers in order to pay down prior years' crop loan debts.

**I.**    **First Guaranty Bank Diverted Funds from Mr. Provost's Crop Loans to Discharge Non-Guaranteed Loans in 2008 and 2009**

79.    During the years 2008 and 2009, First Guaranty Bank used its absolute control over Mr. Provost's application to fraudulently divert monies from his crop loans to pay for other non-guaranteed loans.

80.    To conceal the diversion of Mr. Provost's crop loan monies to discharge other, unrelated non-guaranteed loans, First Guaranty Bank made false statements and inputted false figures in loan applications that were submitted to the FSA for concurrence.  Specifically, in crop loan applications submitted in 2008 and 2009, First Guaranty Bank informed USDA that specific debts would be paid by crop sale proceeds and also inserted figures that forecasted Mr. Provost would spend all the anticipated crop loan funds on specified farm operating expenses.  In actuality, once the crop loans were approved approximately two weeks later, First Guaranty Bank would improperly divert some of those crop loan funds to pay down those debts.  These fraudulent diversions left Mr. Provost with substantially less funds from his crop loans to produce sugarcane and otherwise operate his farm.

81.    As noted above, in 2008, the bank submitted a crop loan application to obtain $841,000 for Mr. Provost.  As also noted above, on May 1, 2008, First Guaranty Bank forced Mr. Provost to obtain a non-guaranteed loan of $495,000 to purchase his father's equipment and refinance his home mortgage.  On that same day, less than two months after the crop loan was approved, First Guaranty Bank withdrew $23,283.06 from the crop loan monies to pay down Mr. Provost's $495,000 loan for his mortgage and equipment.  First Guaranty Bank concealed that

$23,283.06 diversion by falsely stating in Mr. Provost's crop loan application that he would spend all the crop loan monies on unrelated, itemized farm operating expenses.

82.     As noted above, on March 6, 2009, First Guaranty Bank awarded Mr. Provost a crop loan in the amount of $826,500.  First Guaranty Bank improperly withdrew $157,664.70 from the crop loan monies to make: (1) a $94,931.70 payment on Mr. Provost's $495,000 loan for his mortgage and equipment; (2) a $46,002 payment on the $234,000 emergency loan that was taken out by Mr. Provost's father; (3) a $3,000 payment on a mortgage held by Mid-South Bank for land co-owned by Mr. Provost and his brothers; and (4) a $13,731 payment to cover a John Deere credit. In the 2009 loan application, First Guaranty Bank and Senior Vice President Duhon made knowing misrepresentations to FSA to conceal the diversion of $157,664.70 from the 2009 crop loan; specifically, the loan application specifically states that all four above payments would be made from "Sale of Crops."  The loan application also specifically states, in another section, that the $94,931.70 payment on Mr. Provost's $495,000 loan would "be paid from cane equity" and that the John Deere credit would be "paid from equity left to collect."  The 2009 loan application also falsely states that all the crop loan funds would be spent on itemized farm operating expenses.

83.     When First Guaranty Bank made each of these diversions from Mr. Provost's crop loans to pay down non-guaranteed loans, First Guaranty Bank failed to notify Mr. Provost of the diversion (or provide any reason for the diversion).  First Guaranty Bank also concealed the completed loan applications, which contained fraudulent representations and forecasts, from Mr. Provost, who only discovered them when he obtained documents from a whistleblower at the FSA beginning in April 2015.

84.     These misappropriations of Mr. Provost's crop loans by First Guaranty Bank had the predictable and intended effect of materially lessening the yield from, increasing the cost of operating, and undermining the viability of his farm.

85.     Upon information and belief, First Guaranty Bank and Senior Vice President Duhon did not divert monies from crop loans awarded to similarly situated white farmers to pay down non-guaranteed loans.

**J.      First Guaranty Bank Charged Mr. Provost Inflated and Above-Market Interest Rates**

86.     First Guaranty Bank imposed artificially-inflated, above-market interest rates on all the loans that the bank provided to Mr. Provost, including each of the crop loans awarded during 2008 through 2014.  These interest rates were consistently and substantially higher than interest rates typically imposed by First Guaranty Bank on similarly situated white farmers during the same time period.

87.     The following chart compares the interest rate charged on Mr. Provost's crop loans each year with the average annual prime rate during the period in which Mr. Provost received crop loans from First Guaranty Bank, *i.e.* 2008 through 2014.

| Year | Interest Rate Charged on Mr. Provost's Crop Loans | Average Annual Prime Rate |
|------|---------------------------------------------------|---------------------------|
| 2008 | 8.5% | 5.0875% |
| 2009 | 8.0% | 3.25% |
| 2010 | 7.5% | 3.25% |

| 2011 | 7.5% | 3.25% |
| 2012 | 6.9% | 3.25% |
| 2013 | No crop loan provided | 3.25% |
| 2014 | 6.25% | 3.25% |

88.     Meanwhile, similarly situated white farmers received crop loans that contained interest rates that were only slightly above prime rates.  For example, one white farmer in Iberia Parish obtained a $4 million crop loan with an interest rate of 4.9 percent in 2018 when the prime rate was 4.75 percent.

89.     First Guaranty Bank also charged excessively high interest rates on non-guaranteed loans provided to Mr. Provost, such as charging seven percent interest on the $495,000 non-guaranteed loan provided to him in 2008.

90.     First Guaranty Bank profited substantially by charging Mr. Provost excessive interest rates.  Indeed, by mistreating Mr. Provost, First Guaranty Bank was able to provide loans to Mr. Provost that were 90-percent guaranteed by the federal government while also simultaneously imposing above-market interest rates on those low-risk loans.

91.     The excessively high interest rates that First Guaranty Bank charged Mr. Provost had the predictable and intended effect of materially lessening the yield from, increasing the cost of operating, and undermining the viability of his farm.

**K.**  **First Guaranty Bank Required Mr. Provost to Reduce the Acreage that He Farmed**

92.    In 2013 and 2014, First Guaranty Bank and Senior Vice President Duhon insisted that Mr. Provost reduce the acreage that he farmed as a condition of the bank providing crop loans to him.

93.    In 2013, although Mr. Provost had leased 2,410.27 acres of sugarcane, First Guaranty Bank and Senior Vice President Duhon expressly disallowed Mr. Provost from farming on 901.27 of those acres.  Mr. Provost was only permitted by those Defendants to farm on 1,509 acres of sugarcane.

94.    In 2014, although Mr. Provost had leased 1,277.37 acres of sugarcane, First Guaranty Bank and Senior Vice President Duhon expressly disallowed Mr. Provost from farming on 517.37 of those acres.  Mr. Provost was only permitted by those Defendants to farm on 760 acres of sugarcane.

95.    In both of those years, rather than provide adequate loan amounts to Mr. Provost that comported with LSU guidelines, First Guaranty Bank provided wholly insufficient loans and used those highly inadequate loan amounts as a pretext to insist that Mr. Provost shrink his farm.

96.    The predictable effect of First Guaranty Bank requiring Mr. Provost to reduce the acreage of his farm was to materially diminish the potential profitability of the farm and, in turn, the potential income to Mr. Provost.

97.    Upon information and belief, First Guaranty Bank and Senior Vice President Duhon did not require similarly situated white farmers to reduce the acreage of their farms as a condition of the bank providing them crop loans.

**L.    M.A. Patout Denied Mr. Provost Access to Equipment to Operate His Farm and Used the Consequences to Persuade Landlords to Sever Ties with Him**

98.     While First Guaranty Bank was instructing Mr. Provost to reduce the acreage of his farm, M.A. Patout was simultaneously persuading landlords to sever their ties with Mr. Provost and thereby further shrink his farm.

99.     Beginning in 2009, M.A. Patout used advanced and state-of-the-art equipment to maintain, and increase the productivity of, farmland operated by white sugarcane farmers who had contracted with M.A. Patout.  M.A. Patout used that equipment to laser cut, remove trees, dig ditches, haul lime and otherwise maintain farmland operated by white sugarcane farmers, so long as those farmers simply paid the diesel fuel that was expended by the equipment when deployed on their farms.

100.    Between 2009 and 2014, Mr. Provost repeatedly requested, pleaded with, and begged M.A. Patout to deploy that critical equipment on his farm, and he always offered to pay the associated diesel fuel when he did so.  However, M.A. Patout consistently refused to deploy that equipment on Mr. Provost's farm, while simultaneously offering that equipment to and deploying it for the white sugarcane farmers surrounding Mr. Provost's farm.

101.    Between 2009 and 2014, after denying Mr. Provost access to the critical farming and maintenance equipment that was routinely provided to white farmers, M.A. Patout sent employees to persuade landlords to sever ties with Mr. Provost on the basis that he was inadequately maintaining their farmland.  Specifically, those employees of M.A. Patout, including Jackie Judice, told multiple landlords who had contracted with Mr. Provost that he allowed too

many trees to grow on their land and failed to adequately farm it. Those M.A. Patout employees also simultaneously encouraged the landlords to sever ties with Mr. Provost and contract with other farmers, who were white.

102.    As a result of M.A. Patout employees persuading landlords to sever ties with Mr. Provost for reasons entirely manufactured by MA. Patout, the farm operated by Mr. Provost became smaller each year beginning in 2009. Each year, from 2009 through 2014, Mr. Provost lost hundreds of acres of farmland to white farmers, many of whom were less experienced farmers than Mr. Provost. Soon after a white farmer contracted with M.A. Patout to farm land that was previously farmed by Mr. Provost, M.A. Patout would deploy the maintenance equipment onto that farmland that had previously been denied to Mr. Provost.

103.    When a landlord severed ties with Mr. Provost, he often received a similar form letter. The form letters state that the "production on my properties has continued to decline" and the "condition of the land is in a state of deterioration" and thus the landlord has "selected a different tenant farmer." Upon information and belief, that form letter was drafted by M.A. Patout employees.

## M.    First Guaranty Bank Delayed Awarding Crop Loans to Mr. Provost in 2012 and 2014

104.    During 2008 through 2014, Mr. Provost applied for a crop loan as early as possible. First Guaranty Bank informed Mr. Provost that he could not submit a crop loan application until M.A. Patout provided his end-of-the-year retainage documents. M.A. Patout routinely provided those retainage documents in January or early February, and at that point, First Guaranty Bank would allow Mr. Provost to submit a signed (but otherwise blank) crop loan application. Mr.

Provost would request that the application be completed by First Guaranty Bank on the very date he submitted it to the bank, but the bank would reject that request out of hand.

105.    In 2012 and 2014, although the applications were signed and submitted by Mr. Provost at the earliest possible date, First Guaranty Bank unnecessarily delayed the completion and submission of the applications to FSA for many weeks.  These material and unnecessary delays harmed the operations of Mr. Provost's farm.

106.    Meanwhile, First Guaranty Bank did not treat similarly situated white farmers in the same manner in 2012 and 2014.  White farmers' crop loan applications in those years were finalized and executed promptly after their submission, in late January or early February, permitting them to spray herbicide by March.

107.    In 2012, although Mr. Provost submitted his application in early February, First Guaranty Bank did not approve the loan until April 12, which is long after LSU guidelines recommend the *completion* of applying fertilizer and herbicide spraying.  Notably, the loan application is dated March 2, but that date was inserted by the bank, not Mr. Provost, as the bank instructed Mr. Provost to sign and submit blank applications that were subsequently filled in by the bank.

108.    In 2014, although Mr. Provost submitted his application on February 28, First Guaranty Bank did not approve the loan until June 19, which is *three months* after LSU guidelines recommend the *completion* of applying fertilizer and herbicide spraying.

109.    During the period in which First Guaranty Bank delayed the above loan applications, Mr. Provost repeatedly reached out to bank staff to no avail.  The staff at First

Guaranty Bank, including Senior Vice President Duhon, ignored Mr. Provost's calls and visits, and dismissively informed him they the bank was still working on his applications.

110.     Notably, First Guaranty Bank secured approval of the loans on earlier dates in 2008, 2009, 2010 and 2011.   Specifically, loans were approved on March 3, 2008, March 6, 2009, February 24, 2010 and February 17, 2011.  This demonstrates that First Guaranty Bank had the capacity to obtain Mr. Provost's loans in February or early March, but in 2012 and 2014, chose not to do so.

111.     Delaying the approval and disbursement of crop loan funds to Mr. Provost had the predictable and intended effect of materially lessening the yield from, increasing the cost of operating, and undermining the viability of his farm.

**N.      First Guaranty Bank Rejected Mr. Provost's Crop Loan Applications in 2013**

112.     At the beginning of the 2013 sugarcane crop year, Plaintiff registered with Farm Service Agency, his intent to farm 2,410.27 acres of sugarcane.

113.     In 2013, First Guaranty Bank flatly refused to provide a crop loan to Mr. Provost and refused to accept his loan application.

114.     In 2013, at least two landlords who leased their farmland to Mr. Provost contacted Senior Vice President Duhon and urged him to provide Mr. Provost a crop loan. Senior Vice President Duhon was unmoved and continued to reject Mr. Provost's loan application.

115.     As a consequence, FSA Loan Officer William Husband pressured First Guaranty Bank to make some funds available to Mr. Provost.  In response to that pressure, First Guaranty

Bank re-advanced Mr. Provost limited funds from his 2012 line of credit, but the bank continued to refuse to provide a new crop loan to him.

116.    As a result of First Guaranty Bank's rejection of his loan application, Mr. Provost requested the assistance of Kurt Guidry, a professor of agricultural economics at Louisiana State University and the regional director of Louisiana State University Agricultural Center, which assists farmers throughout the state.  Professor Guidry carefully reviewed the financial status of Mr. Provost and his farm and concluded that Mr. Provost should be awarded a crop loan, that the crop loan should be substantially higher per acre than the prior loans he had received, that his debts were not so substantial as to warrant denial of such a loan, and that many sugarcane farmers with greater debt and worse economic circumstances have secured crop loans.  Professor Guidry prepared 21 business plan options in a detailed document for Mr. Provost to present to First Guaranty Bank in order to secure a crop loan.  When Mr. Provost subsequently met with Senior Vice President Duhon in March 2014, Mr. Provost presented the document containing the 21 business plan options, but Senior Vice President Duhon refused to review the document.

117.    In May 2014, Mr. Provost contacted John Pierre, the Vice Chancellor of Southern University, to assist him in his efforts to secure a crop loan.  In turn, Vice Chancellor Pierre contacted FSA and First Guaranty Bank and argued that Mr. Provost was deserving of a crop loan and denial of his loan indicated racial discrimination.  Vice Chancellor Pierre also contacted Joe Leonard, Vice Director the Civil Rights Division of USDA, to complain that Mr. Provost was being subject to discriminatory treatment.

118.    In the wake of the pressure exerted by Vice Chancellor John Pierre, First Guaranty Bank reversed course in 2014 and approved a crop loan application from Mr. Provost for that year.

**O.    M.A. Patout and First Guaranty Bank Conspired for M.A. Patout to Breach Its Contract with Mr. Provost**

119.    Upon information and belief, when Mr. Provost succeeded in obtaining a crop loan in 2014 after Vice Chancellor John Pierre and USDA's Civil Rights Division exerted pressure on First Guaranty Bank, Defendants understood that it would be difficult to extinguish Mr. Provost's farm through continued discriminatory loan practices.  In fact, as a result of USDA's heightened scrutiny of First Guaranty Bank's account with Mr. Provost, First Guaranty Bank radically altered its disclosure procedures with Mr. Provost when it provided him the crop loan in 2014. Specifically, for the first time ever, First Guaranty Bank began sending Mr. Provost "Loan Disbursement Reports" *on a weekly basis* that detailed his available credit and crop loan funds drawn to date.  Similarly, in 2014, First Guaranty Bank suddenly halted its unlawful practice of diverting crop loan funds to discharge other loans and debts that were supposed to be paid with crop sale proceeds.

120.    Without the means of fully extinguishing Mr. Provost's farm through discriminatory loan practices in 2014, it appears that First Guaranty Bank and M.A. Patout developed a scheme to do so by which M.A. Patout would refuse to harvest Mr. Provost's sugarcane, in breach of M.A. Patout's contract with Mr. Provost.

121.    As noted above, on March 21, 2007, Mr. Provost entered into and signed a 14-year agreement whereby M.A. Patout agreed to cut and harvest all of the sugarcane grown by Mr.

Provost beginning in the year 2007 and continuing annually through and including 2021.  The terms provided that M.A. Patout would cut and harvest Mr. Provost's sugarcane for a fee of $4.00 per ton between 2007 and 2012 and for a fee of $5 per ton for the remainder of the contract period. The terms of the 2007 contract also required Mr. Provost to exclusively sell his sugarcane to M.A. Patout.  On the aforementioned date, Randall Romero was the CFO of M.A. Patout.  (Mr. Romero was later promoted to CEO in 2013).

122.     On July 18, 2014, CEO Romero attempted to coerce Mr. Provost into a signing a new contract that provided more favorable terms to M.A. Patout.  Specifically, the new contract charged Mr. Provost a harvesting fee of $8 per ton—nearly twice the price of the existing 2007 contract.  CEO Romero insisted that Mr. Provost sign the new contract containing the onerous terms by July 24, 2014 or M.A. Patout would refuse to cut or harvest Mr. Provost's sugarcane.  As part of the coercion, CEO Romero disavowed knowledge of any existing contract that was already in place between M.A. Patout and Mr. Provost.

123.     In May 2014, Mr. Provost's wife, Angela Provost, launched her own sugarcane farm to generate additional revenue for her family.  She planted and grew sugarcane on a parcel of land that was separate and apart from Mr. Provost's farm.  In January 2014, she requested that M.A. Patout enter into a contract with her to harvest and mill her sugarcane, but M.A. Patout refused to do so.  For that reason, Angela Provost sold her sugarcane to another mill, Cajun Sugar Cooperative.  In February 2014, Angela Provost had also attempted to apply for a crop loan from First Guaranty Bank, but the bank did not permit her to submit an application.  During her meeting with First Guaranty Bank, Angela Provost provided bank executives with a copy of a post-nuptial

agreement titled a "Petition for Separation of Property" that established that Mr. Provost and Angela Provost each operated legally distinct farms. Accordingly, both M.A. Patout and First Guaranty Bank were fully informed that Angela Provost operated her own farm that was legally and operationally distinct from Mr. Provost's farm.

124.    On September 9, 2014, CEO Romero told Angela Provost that he had a "bad feeling" about the Provosts and that Mr. Provost is a "problem."

125.    On December 1, 2014, Jacques Herbert, the President of M.A. Patout, drove his truck onto Mr. Provost's farm. Mr. Provost and Angela Provost noticed that President Herbert was using his phone to record a video of the activities on the farm. When Mr. Provost and Angela Provost began following Mr. Herbert's truck with their own vehicle, he rapidly accelerated and sped away.

126.    Nine days later, on December 10, 2014, M.A. Patout sent a letter to Mr. Provost alleging that he had breached the 2007 contract by selling his sugarcane to another mill, Cajun Sugar Cooperative, and thus had rendered the contract null and void. Mr. Provost and Angela Provost strenuously denied the allegations, informing M.A. Patout that Angela Provost's sugarcane, not Mr. Provost's sugarcane, had been hauled to another mill (after M.A. Patout had refused to contract with Angela Provost). Nonetheless, M.A. Patout refused to harvest any of Mr. Provost's sugarcane, unless he signed the new contract containing the onerous terms.

127.    On December 18, 2014, Senior Vice President Duhon parked his car on the highway adjacent to Angela Provost's farm. He stepped out of his vehicle and stared at Angela Provost while she was operating a truck to harvest sugarcane. He appeared to take several pictures. When

employees of Angela Provost's farm approached Senior Vice President Duhon, he returned to his vehicle and drove away.

128.    During a deposition taken on November 28, 2017, CEO Romero conceded that he did not know for sure whether Mr. Provost had delivered sugarcane to another mill and that M.A. Patout had conducted no investigative work to substantiate that allegation.

129.    Even if M.A. Patout's allegations that Mr. Provost had delivered his sugarcane to another mill had been true (which is not the case), the 2007 contract specifically calls for the payment of liquidated damages in such circumstances, not the termination of the contract.  The written contract contains a provision that presents an equitable remedy in the event Mr. Provost provides his sugarcane to an alternate sugarcane mill.  Paragraph 11 of the 2007 agreement states in pertinent part, "…WENCESLAUS PROVOST, JR. hereby agrees that in the event it shall divert, or cause to be diverted, any sugar which it, or any of its agents, may produce as contemplated by this Agreement to another raw sugar factory, other than one selected by M.A. PATOUT, in violation of this Agreement, WENCESLAUS PROVOST, JR. shall pay unto M.A. PATOUT the sum of EIGHT ($8.00) DOLLARS per ton of sugar cane for each ton of sugar cane so diverted as liquidated damages resulting from the violation of this Agreement."

130.    In an effort to mitigate his damages, Mr. Provost began harvesting his own sugarcane with a whole stalk cane cutter.  However, he was only able to harvest approximately 35 acres of his crop, which he promptly delivered to M.A. Patout.

131.    On December 24, 2014, Mr. Provost met with CEO Romero to request that M.A. Patout comply with its contractual obligations and cut and harvest his sugarcane crop.  During the

meeting, Mr. Provost again explained to CEO Romero that M.A. Patout had confused his wife's sugarcane crop for his own. During the meeting, CEO Romero continued to falsely assert that Mr. Provost was in breach of the original contract and again insisted that Mr. Provost sign the new contract containing onerous terms as a condition of M.A. Patout harvesting Mr. Provost's sugarcane. Mr. Provost refused to sign the coercive contract and instead requested that M.A. Patout honor the operative contract, which was never breached by Mr. Provost.

132.    Earlier that morning, on December 24, 2014, Senior Vice President Duhon sent a letter to employees of FSA and First Guaranty Bank that states, "Looks like June's cane will stay in the field. He did not sign a contract and obtain liability insurance like all others harvesting with Patout Sugar Mill so they couldn't harvest for him and I see a lot of cane in his fields not being harvested. The mills are closing soon, some on Dec. 31 balance between then and January 8th, no way they could harvest balance of cane for customers following the rules and cane for someone not cooperating."

133.    In a letter dated December 31, 2014, CEO Romero again attempted to coerce Mr. Provost into signing the new contract containing onerous terms and again asserted that the 2007 contract was terminated and that M.A. Patout was no longer obligated to harvest Mr. Provost's sugarcane.

134.    In another letter dated January 6, 2015, CEO Romero yet again attempted to coerce Mr. Provost into signing the new contract containing onerous terms and again asserted that the 2007 contract was terminated and that M.A. Patout was no longer obligated to harvest Mr. Provost's sugarcane.

135.    On January 6, 2015, FSA Loan Officer William Husband sent an email to CEO Romero emphasizing that Mr. Provost and Angela Provost operate two separate and distinct farms. The email states, "Please understand that Mrs. Angela A. Provost is unable to enter into any joint mill contact with Wenceslaus Provost Jr.  This is in accordance to the Petition for Separation of Property during Marriage.  This document has been signed by a Judge and recorded on May 16, 2014.  This agreement has been reviewed and approved by OGC for the Farm Service Agency. Mrs. Provost is recognized by the Farm Service Agency as a separate entity from Wenceslaus Provost Jr.  It is illegal for Mrs. Provost to enter into any joint mill contract with Wenceslaus Provost Jr.  All contracts should be addressed to Angela A. Provost only, with no regards or concerns to Wenceslaus Provost Jr."

136.    On the heels of the letter from William Husband, M.A. Patout began harvesting some of Mr. Provost's crop.  Yet, M.A. Patout failed to harvest any of Mr. Provost's crop until January 8, 2015, a mere two days before M.A. Patout closed for the season.  M.A. Patout harvested approximately 300 acres of Mr. Provost's sugarcane but, due to the late start, left approximately 300-400 acres of Mr. Provost's sugarcane untouched in the fields.

**P.**    **First Guaranty Bank Rejected Mr. Provost's Crop Loan Applications in 2015**

137.    In January 2015, Mr. Provost attempted to apply for a crop loan with First Guaranty Bank.

138.    Senior Vice President Duhon informed Mr. Provost that the loan application would not be processed on the grounds that Mr. Provost had too much debt.

**Q.    First Guaranty Bank Forced Mr. Provost to Provide Excessive Collateral and Seized His Personal Assets After Denying Him a Crop Loan in 2015**

139.    When Mr. Provost applied for crop loans, First Guaranty Bank required Mr. Provost to provide excessive collateral as a condition of receiving crop loans.  As noted above, First Guaranty Bank prohibited Mr. Provost from operating his farm as a limited liability corporation, which eased the bank's ability to seize his assets in the event of default.

140.    In 2008 and 2009, as a condition of providing crop and equipment loans to Mr. Provost, First Guaranty Bank took first lien positions on his personal residence, parents' residence, farmland, farm equipment, crops, crop sale proceeds, equipment lease payments, and crop and flood insurance.  First Guaranty Bank did not require such excessive collateral from similarly situated white farmers as a condition of providing crop loans to them; indeed, for many white farmers, the only collateral they had to provide was the potential yield from the sugarcane farm.

141.    After Defendants engineered the default of Mr. Provost on his crop loans through the misconduct discussed above, First Guaranty collected on his collateral.

142.    In November 2016, Mr. Provost filed a Chapter 12 Bankruptcy petition.  In 2017 and 2018, First Guaranty Bank filed objections to Plaintiff's Chapter 12 reorganization plan, in order to ensure that the bank could seize Mr. Provost's assets.  Although First Guaranty Bank continually failed to employ or comply with LSU guidelines when calculating and providing crop loans to Mr. Provost, the bank actually relied on and specifically referenced those LSU guidelines when objecting to the crop input and revenue calculations in Mr. Provost's proposed Chapter 12

bankruptcy reorganization plan.  Mr. Provost's Chapter 12 Bankruptcy petition was dismissed on February 7, 2018.

**R.**     **Injuries to Mr. Provost**

143.    Mr. Provost has suffered substantial financial and psychological injury due to Defendants' misconduct.

144.    As a result of Defendants' misconduct, since 2007, Mr. Provost has produced a materially lower yield from his farm and thus collected significantly less revenue than he otherwise would have.

145.    As a result of Defendants' misconduct, every year since 2008 in which Mr. Provost operated his farm, the size of his farm was reduced.   In crop year 2008, Mr. Provost farmed 4,326.33 acres; in 2009, Mr. Provost farmed 4,295.47 acres; in 2010, Mr. Provost farmed 4045.82 acres; in 2011, Mr. Provost farmed 3,769.41 acres; in 2012, Mr. Provost farmed 3,373.20 acres; in 2013, Mr. Provost farmed 2410.27 acres; and in 2014, Mr. Provost farmed just 1,277.37 acres.

146.    As a result of Defendants' misconduct, every year since 2007, Mr. Provost has generated substantially less profit from operating his farm than he otherwise would have.

147.    As a result of Defendants' misconduct, Mr. Provost was forced to stop sugarcane farming in 2015.

148.    As a result of Defendants' misconduct, Mr. Provost has lost and is in the process of losing all the collateral that was provided to First Guaranty Bank as a condition of receiving loans.

149.    As a result of Defendants' misconduct, Mr. Provost lost his home in a foreclosure sale on September 25, 2018.  In the foreclosure sale, his home was sold to First Guaranty Bank, the sole bidder in the auction.

150.    As a result of Defendants' misconduct, Mr. Provost has outstanding loans with First Guaranty Bank in his name totaling $1,366,322.06.  Those remaining loans include $175,938.73 from the $495,000 equipment loan that was forced on Mr. Provost by First Guaranty Bank; $749,751.65 from the inadequate 2012 crop loan; and $291,264.27 from the inadequate 2014 crop loan.

151.    As a result of Defendants' misconduct, Mr. Provost has suffered substantial psychological and emotional distress.  He and his wife have seen three psychologists since 2015 to treat depression, anxiety and suicidal thoughts stemming from the loss of his farm, the associated financial hardship, and the racial discrimination that he endured.

152.    Due to Defendants' knowledge of the LSU guidelines, Defendants knew that their misconduct would cause the above financial injuries and ultimately extinguish Mr. Provost's farming operation and deprive him of his income, home, other assets, and livelihood.

153.    In the absence of Defendants' misconduct, Mr. Provost would have operated since 2007, and would continue to operate for the foreseeable future, a profitable sugarcane farm on at least 4,300 acres, and he would have no outstanding debts with First Guaranty Bank, except for an annual crop loan that would be fully discharged with the sugarcane yield generated by his farm in that same year.

154.    In or after April 2015, FSA Loan Officer William Husband informed Mr. Provost that he had been systematically discriminated against by First Guaranty Bank and that, had the bank treated Mr. Provost in a non-discriminatory fashion, Mr. Provost would have likely generated the average sugarcane yield per acre in the Vermillion Parish.  In fact, Mr. Husband drafted a "damages" spreadsheet that calculated the yield and revenue lost by Mr. Provost each year from 2007 through 2013 as a direct result of First Guaranty Bank's and Senior Vice President Duhon's misconduct.    According to Mr. Husband's spreadsheet, Mr. Provost was deprived of $21,357,394.46 in revenue during the years 2007 through 2013 as a result of First Guaranty Bank's and Senior Vice President Duhon's misconduct.

**S.**    **Decline of African-American Sugarcane Farmers in Iberia and Vermillion Parishes**

155.    There has been a widespread pattern of experienced African-American farmers in Iberia and Vermillion parishes—where Mr. Provost's farm was located—losing their farms to white farmers.

156.    Between 2007 and 2012, there was a 44.7% decrease in African-American farm operators in Iberia Parish, compared with a 12.3% decrease in white farm operators.

157.    Between 2002 and 2012, African-American farm operators decreased by 17% in Vermillion Parish, compared with a 6% increase in white farm operators.

158.    In 1983, there were approximately 60 African-American families farming sugarcane in the area.  By 2000, that number had dwindled to 17.  Now, following the elimination of Mr. Provost's farm, there are only four African-American sugarcane farmers left in the whole state of Louisiana.

159.    Many of these African-American sugarcane farmers, including Mr. Provost, lost their farms to less experienced white farmers.

**T.    <u>Concealment and Tolling</u>**

160.    Defendants affirmatively concealed and continue to conceal much of their misconduct from Mr. Provost.

161.    Until April 2015, despite exercising due diligence, Mr. Provost could not possibly have learned about the fraudulent misconduct engaged by Defendants, including the misrepresentations made by First Guaranty Bank and Senior Vice President Duhon to USDA. Defendants affirmatively concealed from Mr. Provost all misrepresentations made by First Guaranty Bank and Senior Vice President Duhon to USDA.  Defendants have never disclosed to Mr. Provost any of the documents, communications, or actions that evidence their fraudulent conduct.  Mr. Provost was only able to discover the fraud when, in April 2015, FSA loan officer William Husband acted as a whistleblower and began providing Mr. Provost and his wife access to documents located in Mr. Husband's office.  Those documents—including completed loan applications, other loan-related submissions by First Guaranty Bank to FSA, and communications between employees of First Guaranty Bank and FSA—provided insight into the intentional misrepresentations made by First Guaranty Bank and Senior Vice President Duhon to USDA and how Mr. Provost's crop loan funds had been unlawfully diverted by the First Guaranty Bank.  Mr. Provost and his wife had never seen (or received) those documents until Mr. Husband provided access to them; indeed, as described above, First Guaranty Bank and Senior Vice President Duhon routinely instructed Mr. Provost to sign blank loan applications that they would subsequently and

exclusively complete and submit, without disclosure of those completed documents to Mr. Provost. Accordingly, as a result of Defendants' fraudulent concealment, Mr. Provost's claims for violation of RICO were tolled until April 2015.

162.    Until May 2014, despite exercising due diligence, Mr. Provost could not have possibly learned about the discriminatory misconduct engaged by Defendants, including that Mr. Provost was receiving lower crop loan amounts, with higher interest rates and greater collateral requirements, than similarly situated white farmers.  Mr. Provost first learned that he was being singled out in May 2014 from a USDA official.  That month, he had revealing conversations with FSA loan officer William Husband, who informed Mr. Provost that he was a victim of racial discrimination and the only farmer "being treated this badly" by the bank.  Following his conversations with Mr. Husband, Mr. Provost contacted and requested assistance from John Pierre, the Vice Chancellor of Southern University; Vice Chancellor Pierre, in turn, contacted USDA and First Guaranty Bank and argued that Mr. Provost was deserving of a crop loan and that denial of his loan indicated racial discrimination.  Prior to his conversations with Mr. Husband, despite exercising due diligence, Mr. Provost did not discover and could not have reasonably discovered that he was subject to discrimination.  Mr. Provost did not have access to, and Defendants affirmatively concealed, the terms and implementation of loans provided to other similarly situated white farmers.  First Guaranty Bank and Senior Vice President Duhon also regularly failed to provide Mr. Provost with notice of adverse credit decisions taken by the bank.  Accordingly, as a result of Defendants' concealment, Mr. Provost's claims for violation of ECOA were tolled until May 2014.

163.     The misconduct of the Defendants alleged herein were part of a consistent and continuing policy, pattern and practice of violating ECOA and RICO throughout the time period during which these Defendants were engaged with Mr. Provost.  Mr. Provost's allegations challenge not just a single incident of misconduct but a continuing policy and practice of racial discrimination, RICO violations and failure to provide required notices in violation of ECOA.

164.     Pursuant to the delayed discovery rule and to the doctrines of fraudulent concealment, equitable estoppel, equitable tolling, and continuing violation, any applicable statutes of limitations affecting the right of Mr. Provost to pursue claims alleging violations of ECOA and RICO have been tolled.  Mr. Provost exercised due diligence to learn of his legal rights and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct that gives rise to claims for violations of ECOA and RICO at the time it occurred.

## COUNT I
## VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT
### (Against Defendants First Guaranty Bank and Glenn Duhon)

165.     Plaintiff re-alleges all paragraphs above as if fully set forth herein.

166.     Defendants First Guaranty Bank and Senior Vice President Duhon are creditors and Plaintiff is an applicant as defined in ECOA.

167.     Under ECOA, a "credit transaction" means "every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness;

terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures)." 12 C.F.R. § 1002.2(m).  Accordingly, every aspect of Plaintiff's dealings with Defendants First Guaranty Bank and Senior Vice President Duhon regarding Plaintiff's loan applications and servicing of existing loans were covered credit transactions under ECOA.

168.    The acts of First Guaranty Bank and Senior Vice President Duhon described above of denying Plaintiff equal access to loans, loan servicing programs and the terms and conditions of such loans were the result of racial discrimination in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), which makes it unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, on the basis of race.  Those violations of 15 U.S.C. § 1691(a) committed by First Guaranty Bank and Senior Vice President Duhon include but are not limited to:

    i.      instructing Plaintiff to sign blank loan applications so that the bank could unilaterally fill out the terms;

    ii.      requiring Plaintiff to unnecessarily assume unrelated, significant debt belonging to his father as a condition of receiving crop loans;

    iii.      requiring Plaintiff to provide excessive collateral as a condition of receiving crop loans;

    iv.      requiring Plaintiff to lease equipment to M.A. Patout on unfavorable terms as a condition of receiving crop loans;

    v.      prohibiting Plaintiff from operating through a limited liability corporation;

    vi.      requiring Plaintiff to reduce the acreage of his farm as a condition of receiving crop loans;

vii.      repeatedly awarding Plaintiff crop loans that were substantially smaller in value than what was requested and necessary to effectively operate his farm;

viii.     modifying Plaintiff's loan applications to reduce his loan amounts by, among other actions, forging his signature;

ix.       diverting monies from Plaintiff's crop loans to compensate M.A. Patout;

x.        repeatedly diverting monies from Plaintiff's crop loans to prematurely discharge debts from his prior year's crop loan;

xi.       repeatedly diverting monies from Plaintiff's crop loans to prematurely discharge non-guaranteed loans maintained by creditors;

xii.      routinely charging Plaintiff unreasonably inflated interest rates on both crop loans and non-guaranteed loans;

xiii.     delaying the approval of Plaintiff's loan application in 2012 and 2014;

xiv.      rejecting Plaintiff's crop loan applications in 2013 and 2015; and

xv.       forcing Plaintiff alone to pay down three loans taken by his father even though his older brothers were also co-signers on those loans.

169.    Under ECOA, Defendants First Guaranty Bank and Senior Vice President Duhon were required to provide Plaintiff with a written or oral notice, within a reasonable time, on each occasion that Defendant took an adverse action in relation to Plaintiff's loan applications or loan servicing of existing accounts.

170.    Adverse actions under ECOA include but are not limited to "refusal[s] to grant credit in substantially the amount or on substantially the terms requested in an application" and "unfavorable change[s] in the terms of an account."  12 C.F.R. § 1002.2(c)

171.    First Guaranty Bank and Senior Vice President Duhon further violated ECOA by failing to notify Plaintiff of approval of and adverse actions taken on his loan applications and existing accounts within the timeframes set out under ECOA's regulations.

172.    First Guaranty Bank and Senior Vice President Duhon further violated ECOA by failing to provide 1) a statement of specific reasons for adverse actions taken on his loan applications and existing accounts; and 2) a disclosure of Plaintiff's right to a statement of such specific reasons within the timeframes set out under ECOA's regulations found in 12 CFR § 1002.9.

173.    First Guaranty Bank and Senior Vice President Duhon acted intentionally, maliciously, wantonly, recklessly, and in bad faith as described herein.  First Guaranty Bank's and Senior Vice President Duhon's actions complained of herein were part of a consistent and continuing policy, pattern and practice of violations of ECOA throughout the time period with which these Defendants were engaged with Plaintiff.  Plaintiff's allegations challenge not just a single incident of misconduct but a continuing policy and practice of racial discrimination and failure to provide required notices in violation of ECOA.  The illegality of these Defendants' actions was fraudulently concealed from Plaintiff and not revealed until an FSA whistleblower verbally informed Plaintiff that he was a victim of discrimination in May 2014 and provided Plaintiff access to underlying documents and transactions giving rise to these claims beginning in April 2015.

174.  Plaintiff seeks monetary and equitable relief available under ECOA, including economic, non-economic and punitive damages and equitable relief sufficient to redress and remedy the discrimination alleged herein.

## COUNT II
## BREACH OF CONTRACT
### (Against Defendant M.A. Patout)

175.  Plaintiff re-alleges all paragraphs above as if fully set forth herein.

176.  Louisiana Civil Code articles 1758, 1994, and 1997 provide that:

    i.   An obligation may give the obligee the right to:

        a. Enforce the performance that the obligor is bound to render;

        b. Enforce performance by causing it to be rendered by another at the obligor's expense; and

        c. Recover damages for the obligor's failure to perform, or his defective or delayed performance.

    ii.   An obligor is liable for the damages caused by his failure to perform a conventional obligation.

    iii.   An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.

177.  On March 21, 2007, Plaintiff entered into and signed a 14-year agreement whereby M.A. Patout was obliged to cut, harvest, and purchase all of the sugarcane grown by Plaintiff beginning in the year 2007 and continuing annually through and including 2021.  The terms

provided that M.A. Patout would cut and harvest Mr. Provost's sugarcane for a fee of $4 per ton between 2007 and 2012 and for a fee of $5 per ton for the remainder of the contract period.

178.    In 2014, M.A. Patout acted in bad faith and failed to comply with its obligations under the 2007 contract.  Specifically, M.A. Patout refused to harvest and purchase the sugarcane grown by Mr. Provost that year in an attempt to improve the contract price and obtain other concessions from Mr. Provost as outlined above.  Such actions by M.A. Patout constituted a failure by M.A. Patout to perform its contractual obligations to Plaintiff, in bad faith, for which M.A. Patout is liable to Plaintiff for all damages caused thereby, whether foreseeable or not, that were in direct consequence of M.A. Patout's failure to perform.

<div align="center">

**COUNT III**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(Against Defendants First Guaranty Bank and Glenn Duhon)**

</div>

179.    Plaintiff re-alleges all paragraphs above as if fully set forth herein.

180.    At all relevant times, Defendants and Plaintiff each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

181.    At all relevant times, Defendants together constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4), as they were associated in fact to accomplish joint purposes, both legitimate and illegitimate, including to profit at the expense of, fraudulently divert monies from, seize assets from, diminish and ultimately extinguish Plaintiff's farm.

182.    The Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Enterprise financed the farming and sale of, and engaged in the harvesting and

sale of, sugarcane in interstate commerce, and it transacted business through the use of the United States mails and interstate telephone wires.

183.    Defendants are each separate entities, distinct from the Enterprise itself, which unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

184.    The Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged.  On a routine and continuing basis, First Guaranty Bank, at the direction of Senior Vice President Duhon, provided crop loans to sugarcane farmers who contracted with, and sold sugarcane to, M.A. Patout, which in turn, at the direction of CEO Romero, distributed revenue from those sugarcane sales to discharge the crop loans originally provided by First Guaranty Bank.  To perform these functions, which profited each member of the Enterprise, Defendants engaged in frequent communication and coordination and operated through a consensual decision-making structure.

185.    A common and shared purpose of the Enterprise was to profit at the expense of, fraudulently divert monies from, seize assets from, diminish and ultimately extinguish Plaintiff's farm.

186.    In furtherance of the common and shared purpose of profiting at the expense of, fraudulently diverting monies from, seizing assets from, diminishing and ultimately extinguishing Mr. Provost's farm, the Enterprise engaged in, on a continuing basis, coordinated actions during the period 2007 through 2015, including but not limited to: (a) M.A. Patout and CEO Romero

transmitted Mr. Provost's sugarcane retainage documents to First Guaranty Bank and Senior Vice President Duhon; (b) First Guaranty Bank and Senior Vice President Duhon awarded crop loans to Mr. Provost to produce sugarcane that was harvested by and sold to M.A. Patout; (c) as a condition of providing those loans, First Guaranty Bank and Senior Vice President Duhon required Mr. Provost to purchase equipment he did not want and lease that equipment to M.A. Patout at below market rates; (d) First Guaranty Bank and Senior Vice President Duhon prohibited Mr. Provost from purchasing his father's farmland and thereby facilitated the sale of that land to M.A. Patout; (e) First Guaranty Bank and M.A. Patout awarded crop loans to Mr. Provost that were substantially smaller in value than what was requested and necessary to effectively operate his farm; (f) First Guaranty Bank and Senior Vice President Duhon improperly diverted monies from Mr. Provost's crop loans to compensate M.A. Patout as well as discharge prior years' crop loans and other loans; (g) First Guaranty Bank and Senior Vice President Duhon required Mr. Provost to reduce the acreage of his farm as a condition of receiving crop loans, while M.A. Patout and CEO Romero, through their agents, persuaded landlords to sever ties with Mr. Provost; (h) First Guaranty Bank and Senior Vice President Duhon facilitated M.A. Patout's and CEO Romero's decision in 2014 to stop accepting sugarcane harvested by Mr. Provost, in breach of his contract with the mill; and (i) First Guaranty Bank and Senior Vice President Duhon rejected Mr. Provost's crop loan application 2015 in part due to M.A. Patout's refusal to harvest Mr. Provost's crop. To perform these functions, the members of the Enterprise engaged in frequent communication and coordination and operated through a consensual decision-making structure.

187.     First Guaranty Bank and Senior Vice President Duhon each participated in the conduct, operation, and management of the Enterprise and perpetrated particular racketeering acts in furtherance thereof, including deciding what misrepresentations to transmit to USDA and transmitting such misrepresentations to USDA.

188.     As part of, in furtherance of, and in connection with the conduct and control of the Enterprise, First Guaranty Bank and Senior Vice President Duhon repeatedly made misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to it, which constitutes a pattern of racketeering activity.

189.     From 2007 through 2015, to effectuate the Enterprise's goal of profiting at the expense of, fraudulently diverting monies from, seizing assets from, diminishing, and ultimately extinguishing Plaintiff's farm, First Guaranty Bank and Senior Vice President Duhon engaged in a pattern of racketeering activity.  As part of, in furtherance of, and in connection with the conduct and control of the Enterprise, First Guaranty Bank and Senior Vice President Duhon repeatedly and knowingly transmitted misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to Mr. Provost's farm, via mail and wires. Specifically, during the period 2007 through 2015, on multiple occasions each year, First Guaranty Bank and Senior Vice President Duhon transmitted electronic and paper documents containing misrepresentations about Mr. Provost's farm and the loans provided to Mr. Provost's farm to USDA.

190.     From 2007 through 2015, Defendants associated together for the purpose of, among other things, executing a scheme to defraud through a pattern of racketeering consisting of distinct predicate acts.

191.    The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

192.    *Mail Fraud.* Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud) involved First Guaranty Bank and Senior Vice President Duhon knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme.  The scheme to defraud included First Guaranty Bank and Senior Vice President Duhon knowingly and intentionally mailing misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to Mr. Provost's farm, as set out above, for the fraudulent purpose of diverting monies from, diminishing, and extinguishing Mr. Provost's farm and depriving Mr. Provost of money and property by trick, deceit, chicane, or overreaching.

193.    *Wire Fraud.* Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved First Guaranty Bank and Senior Vice President Duhon knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included First Guaranty Bank and Senior Vice President Duhon knowingly and intentionally electronically mailing misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to Mr. Provost's farm, as set out above, for the fraudulent purpose of

diverting monies from, diminishing, and extinguishing Mr. Provost's farm and depriving Mr. Provost of money and property by trick, deceit, chicane, or overreaching.

194.    The scheme to defraud involved First Guaranty Bank and Senior Vice President Duhon, as part of and in connection with the conduct and control of the Enterprise, making misrepresentations about Mr. Provost's farm and the loans provided to Mr. Provost's farm—using either mail or electronic communications—to USDA on multiple occasions during each year from 2007 through 2015.   Each of those misrepresentations was made for the purpose of diverting monies from, seizing assets from, profiting at the expense of, defrauding, diminishing, and extinguishing Mr. Provost's farm.   Those misrepresentations made by First Guaranty Bank and Senior Vice President Duhon that establish the pattern of racketeering activity include, but are not limited to:

- In September 2007, First Guaranty Bank and Senior Vice President Duhon falsely informed USDA via mail and/or wire communications that Mr. Provost sought to assume the debts of his father, including a $234,000 debt that his father owed to USDA.

- In September 2007, First Guaranty Bank and Senior Vice President Duhon falsely informed USDA via mail and/or wire communications that Mr. Provost sought to purchase his father's used equipment and subsequently lease that equipment to M.A. Patout, at the same below market rates that his father had charged M.A. Patout.

- On February 4, 2008, First Guaranty Bank and Senior Vice President Duhon mailed and/or transmitted electronically a crop loan application to USDA that contained the following misrepresentations: (1) that the payment of $333,053 to discharge the 2007 crop loan provided by M.A. Patout would be made with crop sale proceeds; and (2) that the total crop loan monies of $841,200 would be spent on legitimate farm operating and living expenses.

- On February 26, 2009, First Guaranty Bank and Senior Vice President Duhon mailed and/or transmitted electronically a crop loan application to USDA that contained the following misrepresentations: (1) that the payment of $73,305 to discharge the 2008 crop loan would be made with crop sale proceeds; (2) that the total crop loan monies of $826,500

would be spent on legitimate farm operating and living expenses; (3) that a $94,931.70 payment toward Mr. Provost's $495,000 loan to buy his father's equipment would be made with crop sale proceeds; (4) that a $46,002 payment toward his father's $234,000 emergency loan would be made with crop sale proceeds; (5) that a $13,731 payment to cover a John Deere credit would be made with crop sale proceeds; and (6) that a $3,000 payment on a mortgage held by Mid-South Bank would be made with crop sale proceeds.

- On March 2, 2012, First Guaranty Bank and Senior Vice President Duhon mailed and/or transmitted electronically a crop loan application to USDA that contained the following misrepresentations: (1) that the payment, including $103,752, to discharge the 2011 crop loan would be made with crop sale proceeds; and (2) that the total crop loan monies of $1,066,000 would be spent on legitimate farm operating and living expenses.

- On February 28, 2014, Mr. Provost signed a crop loan application. First Guaranty Bank then forged Mr. Provost's signature, by photocopying it, onto three other applications and dated all of them April 14, 2014. First Guaranty Bank transmitted the first application to USDA on April 17, 2014, with a request for $308,250, and then transmitted a second application that reduced the requested loan amount by $20,000 to $288,250 on May 7, 2014. After USDA complained about the reduction, First Guaranty Bank submitted a third application on May 9, 2014, restoring the loan amount to $308,250.

- On December 24, 2014, Senior Vice President Duhon sent an email to USDA officials that falsely states that Mr. Provost had failed to sign a contract with M.A. Patout and that M.A. Patout appropriately refused to harvest Mr. Provost's sugarcane. The letter specifically states, "Looks like June's cane will stay in the field. He did not sign a contract and obtain liability insurance like all others harvesting with Patout Sugar Mill so they couldn't harvest for him and I see a lot of cane in his fields not being harvested. The mills are closing soon, some on Dec. 31 balance between then and January 8th, no way they could harvest balance of cane for customers following the rules and cane for someone not cooperating."

195.    The pattern of racketeering activity described above is believed to have begun no later than January 1, 2007, and the frequency and duration of the misrepresentations establishes closed-ended continuity.

196.    The misrepresentations made by First Guaranty Bank and Senior Vice President Duhon as part of the pattern of racketeering were communicated for the purpose of concealing from USDA the actions taken by First Guaranty Bank and Senior Vice President Duhon to saddle

Mr. Provost with unwanted and unnecessary loans and debts, divert substantial crop loan funds from Mr. Provost to prematurely discharge other loans provided by First Guaranty Bank and M.A. Patout, and deny crop loans to Mr. Provost based on false pretenses.  Had the misrepresentations not been made, USDA would have disallowed such conduct and/or deprived First Guaranty Bank of loan guarantees.

197.    The regular misrepresentations made by First Guaranty Bank and Senior Vice President Duhon gave rise to the expectation by Enterprise and its members that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

198.    The predicate acts underlying the pattern of racketeering activity were designed to work in conjunction with each other to assist First Guaranty Bank, Senior Vice President Duhon and other Enterprise members in profiting at the expense of, fraudulently diverting monies from, seizing assets from, diminishing and ultimately extinguishing Mr. Provost's farm.

199.    First Guaranty Bank and Senior Vice President Duhon engaged in and directed the pattern of racketeering with the knowledge of the falsity of their misrepresentations to USDA, and they operated the Enterprise with the specific intent to deceive and defraud Mr. Provost.

200.    First Guaranty Bank and Senior Vice President Duhon received substantial financial benefits from their participation in the Enterprise and from the pattern of racketeering. In particular, the racketeering activity described above permitted First Guaranty Bank and Senior Vice President Duhon to: (1) obtain loan guarantees from USDA for 90 percent of the crop loan amounts provided to Mr. Provost; (2) saddle Mr. Provost with excessive collateral requirements

for his loans; (3) compel Mr. Provost to take out undesirable loans; (4) receive substantial premature payments from Mr. Provost for both guaranteed and non-guaranteed loans; (5) charge excessive interest rates on loans taken by Mr. Provost; and (6) seize Mr. Provost assets, including his home, land, and equipment.

201.    Based on the foregoing, First Guaranty Bank and Senior Vice President Duhon have violated 18 U.S.C. § 1962(c).

202.    As a direct and proximate result of the racketeering activities of First Guaranty Bank and Senior Vice President Duhon, Mr. Provost has been injured in his business and property in an amount to be proven at trial.  These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by First Guaranty Bank and Senior Vice President Duhon.  Mr. Provost was the intended target of those violations of 18 U.S.C. § 1962, and his injuries were reasonably foreseeable consequences thereof.  There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Mr. Provost.

203.    Pursuant to 18 U.S.C. § 1964(c), First Guaranty Bank and Senior Vice President Duhon are jointly and severally liable for three times the damages that Mr. Provost has suffered, plus the costs of bringing this suit (including attorneys' fees).

### COUNT IV
### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D)
### (Against All Defendants)

204.    Mr. Provost realleges each allegation in each of the paragraphs above as if fully set forth herein.

205.    At all relevant times, Defendants and Plaintiff each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

206.    At all relevant times, Defendants together constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4), as they were associated in fact to accomplish joint purposes, both legitimate and illegitimate, including to profit at the expense of, fraudulently divert monies from, seize assets from, diminish, and ultimately extinguish Plaintiff's farm.

207.    Beginning no later than January 1, 2007, each Defendant knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c).  The object of this ongoing conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

208.    The four Defendants conspired with each other to knowingly and intentionally transmit to USDA, by mail or wire, fraudulent information regarding Mr. Provost's farm and the loans provided to Mr. Provost's farm for the common purpose of profiting at the expense of, fraudulently diverting monies from, seizing assets from, diminishing, and ultimately extinguishing Mr. Provost's farm.  These misrepresentations constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, and serve as predicate acts to a pattern of racketeering activity pursuant to 18 U.S.C. §§ 1961(1) and (5).

209.    Defendants agreed, among and between themselves, for First Guaranty Bank and Senior Vice President Duhon to purposefully and knowingly make multiple and recurring

misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to Mr. Provost's

farm during the period 2007 through 2015.

210.    Each of the Defendants adopted the goal of furthering or facilitating the criminal

endeavor of the Enterprise by agreeing to facilitate some of the acts leading to the substantive

RICO offenses.  Those acts include but are not limited to:

(a) First Guaranty Bank and Senior Vice President Duhon instructed Mr. Provost to sign blank crop loan applications so that they could complete, and include falsehoods in, those applications without Mr. Provost's review;

(b) As a condition of providing crop loans to Mr. Provost, First Guaranty Bank and Senior Vice President Duhon required Mr. Provost to purchase equipment he did not want and lease that equipment to M.A. Patout at below market rates;

(c) First Guaranty Bank and Senior Vice President Duhon falsely informed USDA that Mr. Provost sought to assume the debts of his father and purchase his father's used equipment and lease that equipment to M.A. Patout at below market rates;

(d) First Guaranty Bank and Senior Vice President Duhon prohibited Mr. Provost from purchasing his father's farmland and thereby facilitated the sale of that land to M.A. Patout;

(e) First Guaranty Bank and M.A. Patout awarded crop loans to Mr. Provost that were substantially smaller in value than what was requested and necessary to effectively operate his farm;

(f) First Guaranty Bank and Senior Vice President Duhon improperly diverted monies from Mr. Provost's crop loans to compensate M.A. Patout;

(g) First Guaranty Bank and Senior Vice President Duhon improperly diverted monies from Mr. Provost's crop loans to discharge other loans, including the equipment loan taken to purchase equipment and lease that equipment to M.A. Patout;

(h) First Guaranty Bank and Senior Vice President Duhon routinely misrepresented to USDA in crop loan applications that specific debts would be paid from crop sale proceeds, when in fact crop loan funds were improperly diverted to make those payments;

(i) First Guaranty Bank and Senior Vice President Duhon routinely misrepresented to USDA in crop loan applications that crop loan funds would be spent on farm operating expenses, when in fact those crop loan funds were improperly diverted to prematurely discharge other loans;

(j) First Guaranty Bank and Senior Vice President Duhon required Mr. Provost to reduce the acreage of his farm as a condition of receiving crop loans, while M.A. Patout, through its agents, persuaded landlords to sever ties with Mr. Provost;

(k) In 2014, M.A. Patout and CEO Romero refused to harvest or purchase Mr. Provost's sugarcane, in breach of his contract with the mill, and Senior Vice President Duhon falsely informed USDA that M.A. Patout had appropriately refused to harvest or purchase Mr. Provost's sugarcane; and

(l) First Guaranty Bank and Senior Vice President Duhon rejected Mr. Provost's crop loan applications 2015 in part due to M.A. Patout's refusal to harvest Mr. Provost's crop.

211.    First Guaranty Bank and Senior Vice President Duhon received substantial financial benefits from their participation in the Enterprise and from the pattern of racketeering. In particular, the racketeering activity described above permitted First Guaranty Bank and Senior Vice President Duhon to: (1) obtain loan guarantees from USDA for 90 percent of the crop loan amounts provided to Mr. Provost; (2) saddle Mr. Provost with excessive collateral requirements for his loans; (3) compel Mr. Provost to take out undesirable loans; (4) receive substantial premature payments from Mr. Provost for both guaranteed and non-guaranteed loans; (5) charge excessive interest rates on loans taken by Mr. Provost; and (6) seize Mr. Provost assets, including his home, land, and equipment.

212.    M.A. Patout and CEO Romero received substantial financial benefits from their participation in the Enterprise and from the pattern of racketeering activity.  In particular, the racketeering activity permitted M.A. Patout and CEO Romero to: (1) lease and possess equipment

at below market rates; (2) purchase farmland from Mr. Provost's father; (3) receive crop loan repayments prematurely, and (4) replace Mr. Provost with farmers who signed contracts charging higher harvesting rates.

213.    Based on the foregoing, Defendants have violated 18 U.S.C. § 1962(d).

214.    As a direct and proximate result of Defendants conspiring to violate RICO, Mr. Provost has been injured in his business and property in an amount to be proven at trial.  These injuries are a direct result of Defendants' violations of 18 U.S.C. § 1962.  Mr. Provost was the intended target of Defendants' violations of 18 U.S.C. § 1962, and his injuries were reasonably foreseeable consequences thereof.   There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Mr. Provost.

215.    Pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable for three times the damages that Mr. Provost has suffered, plus the costs of bringing this suit (including attorneys' fees).

<div align="center">

**COUNT V**
**VIOLATION OF RICO, 18 U.S.C. § 1962(C)**
**(Against Defendant Glenn Duhon)**
**(Pled in the Alternative to the Third Cause of Action)**

</div>

216.    Plaintiff re-alleges all paragraphs above as if fully set forth herein, except paragraphs 179 through 203.

217.    At all relevant times, First Guaranty Bank, Senior Vice President Duhon and Plaintiff each constituted a "person" within the meaning of 18 U.S.C. § 1961(3), as each was capable of holding a legal or beneficial interest in property.

218.    At all relevant times, the corporation First Guaranty Bank constituted an "Enterprise" within the meaning of 18 U.S.C. § 1961(4).

219.    The Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Enterprise provided loans and other banking services across multiple states, and it transacted business through the use of the United States mails and interstate telephone wires.

220.    Senior Vice President Duhon is a separate person, distinct from the Enterprise itself, who unlawfully used the Enterprise as a vehicle through which unlawful activity was committed.

221.    The Enterprise had an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had an ascertainable structure and system of authority guiding its operations, separate and apart from the pattern of racketeering in which the Enterprise was engaged. The Enterprise employed senior executives with defined roles who directed and managed the daily operations of the Enterprise.

222.    A purpose of the Enterprise was to profit at the expense of, fraudulently divert monies from, seize assets from, diminish, and ultimately extinguish Plaintiff's farm.

223.    Senior Vice President Duhon participated in the conduct, operation and management of the Enterprise and perpetrated particular racketeering acts in furtherance thereof.

224.    As part of, in furtherance of, and in connection with the conduct and control of the Enterprise, Senior Vice President Duhon repeatedly made misrepresentations to USDA regarding Mr. Provost's farm and the loans provided by First Guaranty Bank to Mr. Provost's farm, which constitutes a pattern of racketeering activity.

225.    From 2007 through 2015, to effectuate the Enterprise's purpose of profiting at the expense of, fraudulently diverting monies from, seizing assets from, diminishing and ultimately extinguishing Plaintiff's farm, Senior Vice President Duhon engaged in a pattern of racketeering activity. As part of, in furtherance of, and in connection with the conduct and control of the Enterprise, Senior Vice President Duhon repeatedly and knowingly transmitted misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to Mr. Provost's farm, via mail and wires.  Specifically, during the period 2007 through 2015, on multiple occasions each year, Senior Vice President Duhon transmitted electronic and paper documents containing misrepresentations about Mr. Provost's farm and the loans provided to Mr. Provost's farm to USDA.

226.    The "predicate acts" which constitute the alleged "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) involve two categories of "racketeering activity" set out in 18 U.S.C. § 1961(1): mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

227.    *Mail Fraud*. Each of the acts indictable under 18 U.S.C. § 1341 (mail fraud) involved Senior Vice President Duhon knowingly causing a matter or thing to be sent or delivered by the Postal Service or a commercial mail carrier with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme.  The scheme to defraud included Senior Vice President Duhon knowingly and intentionally mailing misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to Mr. Provost's farm, as set out above, for the fraudulent purpose of diverting monies

from, diminishing, and extinguishing Mr. Provost's farm and depriving Mr. Provost of money and property by trick, deceit, chicane, or overreaching.

228. *Wire Fraud.* Each of the acts indictable under 18 U.S.C. § 1342 (wire fraud) involved Senior Vice President Duhon knowingly causing the use of wire communication to transmit with specific intent and for the purpose of executing a scheme or artifice to defraud in that each was material and incidental to an essential element of the scheme. The scheme to defraud included Senior Vice President Duhon knowingly and intentionally electronically mailing misrepresentations to USDA regarding Mr. Provost's farm and the loans provided to Mr. Provost's farm, as set out above, for the fraudulent purpose of diverting monies from, diminishing, and extinguishing Mr. Provost's farm and depriving Mr. Provost of money and property by trick, deceit, chicane, or overreaching.

229. The scheme to defraud involved Senior Vice President Duhon, as part of and in connection with the conduct and control of the Enterprise, making misrepresentations about Mr. Provost's farm and the loans provided to Mr. Provost's farm—using either mail or electronic communications—to USDA on multiple occasions from 2007 through 2015. Each of those misrepresentations were made for purposes of diverting monies from, seizing assets from, profiting at the expense of, defrauding, diminishing, and extinguishing Mr. Provost's farm. Those misrepresentations specifically include, but are not limited to:

- In September 2007, First Guaranty Bank and Senior Vice President Duhon falsely informed USDA via mail and/or wire communications that Mr. Provost sought to assume the debts of his father, including a $234,000 debt that his father owed to USDA.

- In September 2007, First Guaranty Bank and Senior Vice President Duhon falsely informed USDA via mail and/or wire communications that Mr. Provost sought to purchase his father's used equipment and subsequently lease that equipment to M.A. Patout, at the same below market rates that his father had charged M.A. Patout.

- On February 4, 2008, First Guaranty Bank and Senior Vice President Duhon mailed and/or transmitted electronically a crop loan application to USDA that contained the following misrepresentations: (1) that the payment of $333,053 to discharge the 2007 crop loan provided by M.A. Patout would be made with crop sale proceeds; and (2) that the total crop loan monies of $841,200 would be spent on legitimate farm operating and living expenses.

- On February 26, 2009, First Guaranty Bank and Senior Vice President Duhon mailed and/or transmitted electronically a crop loan application to USDA that contained the following misrepresentations: (1) that the payment of $73,305 to discharge the 2008 crop loan would be made with crop sale proceeds; (2) that the total crop loan monies of $826,500 would be spent on legitimate farm operating and living expenses; (3) that a $94,931.70 payment toward Mr. Provost's $495,000 loan to buy his father's equipment would be made with crop sale proceeds; (4) that a $46,002 payment toward his father's $234,000 emergency loan would be made with crop sale proceeds; (5) that a $13,731 payment to cover a John Deere credit would be made with crop sale proceeds; and (6) that a $3,000 payment on a mortgage held by Mid-South Bank would be made with crop sale proceeds.

- On March 2, 2012, First Guaranty Bank and Senior Vice President Duhon mailed and/or transmitted electronically a crop loan application to USDA that contained the following misrepresentations: (1) that the payment, including $103,752, to discharge the 2011 crop loan would be made with crop sale proceeds; and (2) that the total crop loan monies of $1,066,000 would be spent on legitimate farm operating and living expenses.

- On February 28, 2014, Mr. Provost signed a crop loan application.  First Guaranty Bank then forged Mr. Provost's signature, by photocopying it, onto three other applications and dated all of them April 14, 2014.  First Guaranty Bank transmitted the first application to USDA on April 17, 2014, with a request for $308,250, and then transmitted a second application that reduced the requested loan amount by $20,000 to $288,250 on May 7, 2014.  After USDA complained about the reduction, First Guaranty Bank submitted a third application on May 9, 2014, restoring the loan amount to $308,250.

- On December 24, 2014, Senior Vice President Duhon sent an email to USDA officials that falsely states that Mr. Provost had failed to sign a contract with M.A. Patout and that M.A. Patout appropriately refused to harvest Mr. Provost's sugarcane.  The letter specifically states, "Looks like June's cane will stay in the field.  He did not sign a contract and obtain liability insurance like all others harvesting with Patout Sugar Mill so they couldn't harvest

for him and I see a lot of cane in his fields not being harvested.  The mills are closing soon, some on Dec. 31 balance between then and January 8th, no way they could harvest balance of cane for customers following the rules and cane for someone not cooperating."

230.   The pattern of racketeering activity described above is believed to have begun no later than January 1, 2007, and the frequency and duration of the misrepresentations establishes closed-ended continuity.

231.   The misrepresentations made by Senior Vice President Duhon as part of the pattern of racketeering were communicated for the purpose of concealing from USDA the actions taken by First Guaranty Bank and Senior Vice President Duhon to saddle Mr. Provost with unwanted and unnecessary loans and debts, divert substantial crop loan funds from Mr. Provost to prematurely discharge other loans provided by First Guaranty Bank and M.A. Patout, and deny crop loans to Mr. Provot based on false pretenses.  Had the misrepresentations not been made, USDA would have disallowed such conduct and/or deprived First Guaranty Bank of loan guarantees.

232.   The regular misrepresentations made by Senior Vice President Duhon gave rise to the expectation by the Enterprise that mail and wire communications would be employed when executing the scheme to defraud through a pattern of racketeering.

233.   The predicate acts underlying the pattern of racketeering activity were designed to work in conjunction with each other to assist First Guaranty Bank and Senior Vice President in profiting at the expense of, fraudulently diverting monies from, seizing assets from, diminishing, and ultimately extinguishing Mr. Provost's farm.

234.     Senior Vice President Duhon engaged in and directed the pattern of racketeering with the knowledge of the falsity of his misrepresentations to USDA, and he operated the Enterprise with the specific intent to deceive and defraud Mr. Provost.

235.     First Guaranty Bank and Senior Vice President Duhon received substantial financial benefits from their participation in the Enterprise and from the pattern of racketeering. In particular, the racketeering activity described above permitted First Guaranty Bank and Senior Vice President Duhon to: (1) obtain loan guarantees from USDA for 90 percent of the crop loan amounts provided to Mr. Provost; (2) saddle Mr. Provost with excessive collateral requirements for his loans; (3) compel Mr. Provost to take out undesirable loans; (4) receive substantial premature payments from Mr. Provost for both guaranteed and non-guaranteed loans; (5) charge excessive interest rates on loans taken by Mr. Provost; and (6) seize Mr. Provost assets, including his home, land, and equipment.

236.     Based on the foregoing, Senior Vice President Duhon has violated 18 U.S.C. § 1962(c).

237.     As a direct and proximate result of the racketeering activities of Senior Vice President Duhon, Mr. Provost has been injured in his business and property in an amount to be proven at trial.  These injuries are a direct result of the violations of 18 U.S.C. § 1962 committed by Senior Vice President Duhon.  Mr. Provost was the intended target of those violations of 18 U.S.C. § 1962, and his injuries were reasonably foreseeable consequences thereof.  There are no independent causes which have intervened between the alleged violations of 18 U.S.C. § 1962 and the injuries to Mr. Provost.

238.    Pursuant to 18 U.S.C. § 1964(c), Senior Vice President Duhon is liable for three times the damages that Mr. Provost has suffered, plus the costs of bringing this suit (including attorneys' fees).

## COUNT VI
## UNJUST ENRICHMENT/QUANTUM MERUIT
### (Against All Defendants)

239.    Plaintiff re-alleges all paragraphs above as if fully set forth herein.

240.    Louisiana Civil Code article 2298 provides that: "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person."

241.    Defendants have been enriched by their acts alleged above, including by:

  i.    Requiring Plaintiff to take out unwanted, non-guaranteed loans from First Guaranty Bank as a condition of receiving crop loans;

  ii.    Requiring excessive collateral from Plaintiff as a condition of receiving crop loans, including his land, personal residence, parents' residence, equipment, money, insurance proceeds, crop sale proceeds and other assets;

  iii.    Leasing by Plaintiff of equipment to M.A. Patout on unfavorable terms as a condition of receiving crop loans;

  iv.    Ensuring that M.A. Patout, rather than Mr. Provost, purchased his father's farmland;

  v.    Diverting monies from Plaintiff's crop loans to prematurely compensate M.A. Patout;

  vi.    Diverting monies from Plaintiff's crop loans to prematurely discharge guaranteed and non-guaranteed debts owed to First Guaranty Bank;

  vii.    Charging Plaintiff unreasonably inflated interest rates on both crop loans and non-guaranteed loans provided by First Guaranty Bank;

  viii.    Replacing Mr. Provost with other farmers who entered into newer contracts with M.A. Patout that charged those farmers higher harvesting rates; and

ix.     Seizing the collateral provided by Mr. Provost, including foreclosing on his home and transferring ownership of his home to First Guaranty Bank.

242.    Plaintiff has suffered an impoverishment by Defendants' enrichment, including by:

i.      Production of a materially lower yield from Plaintiff's farm and collection of significantly less revenue than he otherwise would have received;

ii.     Generation of substantially less profit from operating Plaintiff's farm than he otherwise would have;

iii.    Reduction and termination of Plaintiff's sugarcane farm;

iv.     Loss of all the collateral that was provided to First Guaranty Bank as a condition of receiving loans; and

v.      Plaintiff's loss of his home in a foreclosure sale to First Guaranty Bank on September 25, 2018.

243.    Plaintiff's impoverishment has been directly caused by the acts leading to Defendants' enrichment.

244.    There is not legal justification for Defendants' enrichment at Plaintiff's expense, which only occurred because Defendants unfairly and unlawfully conducted business with Plaintiff.

245.    To the extent that Plaintiff's other claims fail to provide a complete remedy at law to Plaintiff, Defendants' unjust enrichment at Plaintiff's expense is actionable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants as follows:

i.      An Order declaring Defendants First Guaranty Bank's and Glenn Duhon's actions to be a breach of Plaintiff's rights under ECOA and awarding Plaintiff monetary

and injunctive relief, including economic, non-economic, and punitive damages, appropriate to the proof at trial;

ii.   An Order declaring Defendants M.A. Patout's actions to be a breach of a contract entered into with Plaintiff and awarding Plaintiff monetary and injunctive relief, including economic, non-economic and punitive damages, appropriate to the proof at trial;

iii.   An Order declaring all four Defendants' actions to be violations of RICO and awarding Plaintiff monetary and injunctive relief, including economic, non-economic, treble and punitive damages, appropriate to the proof at trial;

iv.   An Order granting Plaintiff an award of attorneys' fees and costs pursuant to ECOA and RICO;

v.   An Order granting Plaintiff an award of pre- and post-judgment interest; and

vi.   An Order granting any and all other relief that the Court determines proper and fair.

Dated: March 6, 2019                          Respectfully submitted,

/s/ Andrew A. Lemmon
Andrew A. Lemmon
Louisiana State Bar No. 18302
**LEMMON LAW FIRM**
P.O. Box 904
Hahnville, Louisiana 70057
985.783.6789 Voice
985.783.1333 Facsimile

George F. Farah (to apply *pro hac vice*)

HANDLEY FARAH & ANDERSON PLLC
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 477-8090
gfarah@hfajustice.com

Matthew K. Handley (to apply *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com

William A. Anderson (to apply *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajsutice.com

***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I certify that, on the date indicated below, I served the foregoing document, and any accompanying or attached documents via the Court's electronic filing system and via e-mail on the following:

- **Quinton N. Robinson**
  Aggistics@outlook.com

Date:  March 6, 2019                          ___/s/Andrew A Lemmon_____
                                             Andrew A Lemmon